877 A.2d 433

COMMONWEALTH of Pennsylvania, Appellee,

v.

Antyane ROBINSON, Appellant.

Supreme Court of Pennsylvania.

Submitted March 12, 2003.

Decided June 22, 2005.

360

364

David J. Foster, Esq., for Antyane Robinson.

Jaime M. Keating, Esq., Amy Zapp, Esq., for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Justice EAKIN.

Antyane Robinson appeals from the order denying his petition for relief pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546, following a hearing. We affirm.

The relevant facts are as follows:

Appellant dated Tara Hodge on and off during the time period beginning in early 1993 until February 1995, when Hodge discovered that appellant had another girlfriend. They did not see each other for over a year, until March 30, 1996, when appellant re-established an intimate relationship with Hodge. Between March 30, 1996 and the night of the incident in question, Hodge was with appellant for one night on both March 30 and April 30, four days between May 10 and 13, and one night on June 1, 1996. Hodge met Rashawn Bass on May 26, 1996, after she responded to a personal ad in the local paper. On June 10, 1996, Hodge broke off the relationship with appellant by letter.

On the evening of June 29, 1996 . . . Hodge met Bass at her apartment. . . . After eating . . . pizza, Bass took a shower. Shortly after midnight, while Bass was in the shower, appellant arrived at [Hodge's] apartment. . . . Hodge let him into her apartment. Upon finding that Hodge had a guest at her apartment appellant and Hodge had an argument. Appellant requested that Hodge ask Bass to leave. When Hodge refused to ask Bass to leave, appellant pulled a gun out of his "sweats," which he pointed at Hodge and shot her. . . .

At about 1 a.m. on the morning of June 30, 1996, Hodge regained consciousness in a pool of her own blood. She then entered the bathroom where she saw that Bass was dead inside the shower stall. She was able to drag herself to her next door neighbor's home. The police arrived at the neighbor's house and saw that Hodge had a head wound. Unable to speak, Hodge wrote a note directing the police to her apartment. The ambulance arrived and took Hodge to

the hospital. The officer went to Hodge's apartment and found Bass' body in the shower. After leaving the apartment, the officer went to the hospital to speak with Tara Hodge. At the hospital, Hodge identified appellant as the person who had shot her.

\* \* \*

At the time of arrest, appellant ... was advised of his Miranda rights and signed a written waiver. [A]ppellant stated that he knew Tara Hodge and her family. Appellant also told police that he had owned a 9 millimeter handgun, which had been stolen by his niece's boyfriend before June, and a 380 handgun, which he had sold.

The police conducted a search of appellant's room in his parents' home in Fort Washington, Maryland. In the bedroom, they found documents in a locked safe relating to a 9 millimeter Lorcin handgun. They did not find the weapon. They also found a picture of appellant holding a 9 millimeter Star handgun, as well as a Federal 44 SPL revolver with ammunition. The police also found the letter from Tara Hodge postmarked June 10, 1996. The police also searched the residence of a woman whom appellant was dating. They found some of appellant's belongings at her house, including 9 millimeter ammunition.

*Commonwealth v. Robinson,* 554 Pa. 293, 721 A.2d 344, 349–50 (1998). Appellant was convicted and sentenced to death.

Appellant's claims for relief encompass the following areas: (1) pretrial issues; (2) trial issues; (3) jury charge issues; (4) penalty phase issues; and (5) a proportionality of sentencing issue.[1]

---

1. Appellant's issues have been re-ordered for clarity. Specifically, appellant asserts he is entitled to PCRA relief because:

 (1) Trial counsel was ineffective for failing to develop and introduce evidence warranting a voluntary manslaughter charge and verdict and for failing to properly argue on direct appeal that appellant was entitled to an instruction on voluntary manslaughter.

 (2) His death sentence is based upon an improper application of the perpetration of a felony aggravating circumstance and counsel was ineffective in failing to litigate claims about this aggravator.

Five of appellant's issues have been previously litigated. An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue[.]" 42 Pa.C.S. § 9544(a)(2). On direct appeal, appellant asserted Tara Hodge provoked him into the killing; he claimed entitlement to a voluntary manslaughter charge. However, as Hodge was not the victim and appellant did not claim he was attempting to kill her, this Court held a voluntary manslaughter charge was without legal support. *Robinson*, at 354. Appellant's assertion of counsel's ineffectiveness will not revive this issue. *See Commonwealth v. Bracey*, 568 Pa. 264, 795 A.2d 935, 939 n. 2 (2001) (appellant cannot obtain post

(3) Trial counsel's failure to investigate and present at sentencing the readily available evidence of appellant's increasingly paranoid behavior, paranoid schizophrenia, family dysfunction and abuse, diminished capacity and emotional trauma at the time of the offenses deprived him of his constitutional right to the effective assistance of counsel.
(4) The sentencing jury, after hearing argument about his future dangerousness, was never instructed that, if sentenced to life, appellant would be ineligible for parole.
(5) Trial counsel was ineffective for failing to object to the Commonwealth's cross-examination of appellant's mother at the penalty phase.
(6) Appellant was tried while incompetent and his counsel was ineffective.
(7) The Commonwealth's continuous misconduct throughout appellant's capital trial and sentencing prejudiced appellant.
(8) Defense counsel failed to object to irrelevant and improper victim impact testimony and argument.
(9) Trial counsel was ineffective for failing to object to the court's erroneous charge during the guilt phase wherein the court repeatedly stated if appellant had a specific intent to kill, the killing was with malice.
(10) There was insufficient evidence to support the jury's finding of the (d)(7) aggravating circumstance, and the trial court failed to include the required limiting instruction rendering the (d)(7) aggravating circumstance vague and overbroad, and counsel was ineffective in failing to litigate these.
(11) Trial counsel was ineffective for failing to effectively argue on direct appeal that the court's refusal to admit testimony of appellant's mother about why he had guns violated appellant's constitutional rights to due process and fair trial, and the refusal to admit this testimony prejudiced appellant.
(12) The proportionality review performed by this Court was constitutionally defective.

conviction review of claims previously litigated on appeal by alleging ineffective assistance of prior counsel and presenting new theories of relief to support previously litigated claims).

On direct appeal, appellant asserted the evidence was insufficient to support the finding of the (d)(7) [2] aggravating circumstance, and that the trial court failed to include the required limiting instruction, rendering the aggravator vague and overbroad. He now claims counsel was ineffective in failing to litigate these claims, but offers nothing that was not already reviewed by this Court on direct appeal.

Additionally, on direct appeal this Court concluded a *Simmons*[3] charge was not necessary because appellant's future dangerousness was not expressly implicated. *Robinson*, at 355. Any trial reference to appellant's past dangerousness did not run afoul of *Simmons*, and appellant's assertion of counsel's ineffectiveness will not revive this issue. *See Bracey, supra.*

On direct appeal, appellant asserted the trial court erred in not allowing his mother to testify concerning his gun possession. This Court concluded, "[a]lthough ... the trial court erred in refusing to allow Mrs. Robinson to testify, based on ... harmless error analysis, the instant case presents the situation where properly admitted evidence of guilt was overwhelming. Accordingly, this error was harmless." *Robinson*, at 353. Appellant's assertion of counsel's ineffectiveness will not revive this issue. *See Bracey, supra.*

**2.** "In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense." 42 Pa.C.S. § 9711(d)(7).

**3.** *See Simmons v. South Carolina*, 512 U.S. 154, 166, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (jury instruction that life imprisonment means life without possibility of parole); *see also Commonwealth v. Jones*, 571 Pa. 112, 811 A.2d 994, 1004 (2002) ("a *Simmons* charge is triggered only upon the existence of twin requirements, *i.e.*, future dangerousness being placed at issue, and a defense request.") (internal citation omitted).

## PRETRIAL ISSUE

■ Appellant asserts he was tried while incompetent, and counsel was ineffective for failing to investigate and challenge appellant's competency.

■ Appellant is required to "plead and prove by a preponderance of the evidence ... that the conviction or sentence resulted from ... ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014, 1020 (2003) (quoting *Commonwealth v. Pierce*, 567 Pa. 186, 786 A.2d 203, 213 (2001)). *See also* 42 Pa.C.S. § 9543(a)(2)(ii). It is the ineffectiveness claim, not the underlying error at trial, which is reviewed. *Commonwealth v. Clayton*, 572 Pa. 395, 816 A.2d 217, 220 (2002). To establish ineffectiveness, appellant must show: (1) the claim has arguable merit; (2) counsel had no reasonable strategic basis for his or her action; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. *Commonwealth v. Kimball*, 555 Pa. 299, 724 A.2d 326, 333 (1999). Appellant bears the burden of proving all three prongs, *Commonwealth v. Travaglia*, 541 Pa. 108, 661 A.2d 352, 357 (1995); failure to prove any of these prongs is sufficient to warrant dismissal of the claim without discussion of the other two. *Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717, 738 n. 23 (2000).

Pursuant to 50 P.S. § 7402(c),[4] appellant's treating psychiatrist and psychologist at the prison petitioned for his involuntary commitment. The trial court ordered appellant to undergo evaluations to determine whether he was competent to stand trial. Appellant was admitted to a state hospital December 26, 1996, and his status was assessed weekly.

4. "An application for Incompetency Examination.—Application to the court for an order directing an incompetency examination may be presented by ... other official in charge of the institution or place in which [the defendant] is detained." 50 P.S. § 7402(c).

Appellant asserts that at the time of trial, he suffered from paranoid schizophrenia, rendering him incompetent. To support this claim, he offers the following: (1) during his incarceration, he refused to eat, claiming the food was poisoned; (2) he has a family history of mental illness; (3) trial counsel testified appellant was paranoid, believed all of Carlisle, Pennsylvania was trying to kill him, was unwilling to talk to his attorneys, and counsel admittedly failed to investigate appellant's competency; (4) the results of an examination by Dr. Rocco Manfredi at Norristown Psychiatric Hospital found appellant suffered from paranoid ideation; and (5) testimony from Drs. Ragusea and Rotenberg, taken five years after the murder, stated that at the time of trial appellant was not competent.[5]

Appellant's claim is contrary to a mental health evaluation by Dr. Murray Caplin, a board certified psychiatrist, performed less than one year after the murder and a month before trial began. On February 7, 1997, after six weeks of observation, Dr. Caplin diagnosed appellant as possibly malingering with no indication of mental illness. *See* Letter by Murray S. Caplin, M.D., to the Honorable Edgar B. Bayley, 2/7/97. Dr. Caplin's report noted appellant would not talk without his lawyer present. *Id.* The doctor opined this was a deliberate attempt to postpone trial, and concluded appellant was fit to stand trial. *Id.* At the PCRA hearing, the Commonwealth offered rebuttal testimony from John O'Brien, M.D., a board certified psychiatrist from Philadelphia, Pennsylvania.

We agree with the PCRA court that counsel reasonably relied on the mental health evaluation conducted by Dr. Caplin and staff at the state hospital. The PCRA court noted the mental health observations indicated: (1) appellant was able to interact with people when he wanted to; (2) the fact he did not cooperate with counsel did not mean he was unable to; (3) appellant's jealousy and rage towards Tara Hodge did not equal mental illness; (4) appellant's family history was not consistent with paranoid schizophrenia; (5) the reports Dr.

5. Both doctors diagnosed appellant after reviewing his hospital records. Neither doctor was able to evaluate appellant in person because he failed to cooperate.

Rotenberg reviewed did not contain anything regarding how appellant adjusted in prison in the past four years, but used only data from appellant's short stay in Cumberland County Prison. Further, the PCRA court made a credibility determination between testifying experts that there was no basis for arriving at the conclusion appellant was incompetent.

Although appellant offered testimony of two different psychiatrists in support of his claim, this testimony was negated by the evaluation done less than a year after the murder, which concluded appellant was competent. Accordingly, trial counsel was not ineffective and this claim warrants no relief. *See Commonwealth v. Bracey*, 568 Pa. 264, 795 A.2d 935, 942 (2001) (testimony of two physicians who examined appellant five and six years after murder and concluded he had organic brain damage was negated by evaluation done less than one year after killing); *Commonwealth v. Lewis*, 560 Pa. 240, 743 A.2d 907, 909 (2000) (testimony from psychiatrist, who examined appellant 15 years after killing, was negated by mental health evaluation taken less than one year after murder). Further, as appellant has failed to establish the ineffectiveness of trial counsel, this necessarily defeats his claim that appellate counsel was ineffective. *See McGill*, at 1023.

## TRIAL ISSUES

■ Appellant asserts he was prejudiced by pervasive prosecutorial misconduct throughout his trial. First, he asserts the prosecutor improperly used his race by portraying him as a young man from the big city that was disrespected and sought retribution. Appellant's Brief, at 21. Appellant argues these remarks had a definite racial overtone, which was highly prejudicial and improper. *Id.*

■ A prosecutor's remarks are fair if they are supported by evidence or contain inferences reasonably derived from that evidence. *Commonwealth v. Carter*, 537 Pa. 233, 643 A.2d 61, 75 (1994). "[P]rosecutorial misconduct does not occur unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed

bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict." *Commonwealth v. Paddy,* 569 Pa. 47, 800 A.2d 294, 316 (2002) (citing *Commonwealth v. Rizzuto,* 566 Pa. 40, 777 A.2d 1069 (2001)). Due to the nature of a criminal trial, both sides must be allowed reasonable latitude in presenting their cases to the jury. *See id.* A prosecutor's comments must be reviewed in the context in which they were made. *Commonwealth v. Smith,* 490 Pa. 380, 416 A.2d 986, 989 (1980).

Appellant asserts trial counsel was ineffective for failing to object where the prosecutor injected race into the argument. The Commonwealth argues, "[t]he lack of respect for human life over a perceived disrespect or the perception of the defendant as an outsider has nothing to do with race." Commonwealth's Brief, at 24. We agree. Specifically, appellant takes issue with the following comments made by the prosecutor in his opening statement:

> This is going to be a case of images, ladies and gentlemen. Every case like this has a theme, I suppose, and in this one you are going to see how a young man and a young woman paid the big city price for a perceived disrespect. You've all heard that word, and you've seen it in television shows. He disrespected me.

> You are going to hear evidence about this perceived disrespect, a disrespect to that man and how he responded to it. Because I'm from the big city, you disrespected me, I'm going to have to hurt you.

> \* \* \*

> You'll say, sir, you got the benefit of every one of those rights, but you don't come up here into this county and shoot a boy and a hard working young lady....

N.T., 3/12/97, at 5–6, 12. The prosecutor continued this theme in his closing:

> Now there was an image projected here, and it's that big city image. You'll get to look at this. Man, I got to carry a gun wherever I go. He's not the person in here that all my

life I've been treated so badly. This is the image of a kind of person capable of forming the specific intent to kill. This is a lifestyle. You look at that and you judge these acts carefully.

\* \* \*

I would say an ordinary person doesn't want to do that, but a person that wants to project this kind of image, the kind of guy that has to drive into Cumberland County and have guns in his waistband and his home has to have a bullet proof vest, those are the kind of guys I submit to you that say I ain't going to be disrespected, disrespect me and you're going to have to pay.

N.T., 3/13/97, at 273, 277.

Appellant relies on *Commonwealth v. Anderson*, 490 Pa. 225, 415 A.2d 887 (1980); his reliance is misplaced. In *Anderson*, this Court held the prosecutor committed misconduct when he referred to appellant as an "executioner" and "asked the jury to draw unwarranted inferences the victim was killed because he violated some code...." *Id.*, at 889. The record in *Anderson* did not support such an argument; there was no support for a motive to murder the victim because he violated "some code" of the streets.

Here, the prosecutor's remarks were not a deliberate attempt to destroy the objectivity of the jury, but merely summarized the evidence presented at trial with oratorical flair permitted during argument. *See Commonwealth v. Barren*, 501 Pa. 493, 462 A.2d 233 (1983). The theme of the prosecution throughout trial was that appellant had a reputation to protect, and when he found out his girlfriend was seeing another man, he felt disrespected. The prosecution did not mention the fact appellant is an African–American, nor do the comments suggest, as appellant argues, that because of his race he was more likely to kill to protect his reputation. Further, trial counsel testified that initially she thought the statement was unfair, but as the trial proceeded and evidence was introduced, she realized the statements were supported by the evidence. N.T., 10/10/01, at 89.

■ Concerning appellant's claims of counsel's ineffectiveness, it must be noted he was representing himself during opening arguments. Trial counsel testified to a written agreement between herself and appellant where counsel would not offer any advice unless asked. N.T. PCRA Hearing, 10/10/01, at 88. Appellant never asked counsel for guidance during opening statements. He cannot now claim he was ineffective or that standby counsel was ineffective because he never sought her guidance. *See Commonwealth v. Tilley*, 566 Pa. 312, 780 A.2d 649, 653 n. 9 (2001) (citing *Commonwealth v. Auker*, 545 Pa. 521, 681 A.2d 1305, 1319 (Pa.1996) (defendant cannot raise his own ineffectiveness)).

At the time of closing, standby counsel was counsel of record. When asked at the PCRA hearing whether those comments were objectionable, counsel testified, "to be honest, I think they were borderline. I chose not to object to them because I didn't want to draw unnecessary attention to them by the jury and just try to make attempts to neutralize it in my own closing. . . ." N.T. 10/10/01, at 92. Further, counsel testified the prosecution's argument was supported by the evidence. *Id.*, at 89. It is difficult to ascertain what prejudice allegedly resulted from the prosecutor's comments, and appellant has not demonstrated but for these comments, the outcome of his trial would have differed. Accordingly, his claim of trial counsel's ineffectiveness fails, which necessarily defeats his claim of appellate counsel's ineffectiveness. *McGill*, at 1023. Since appellant is not entitled to relief on his underlying claim, we need not remand for development of the remaining two prongs of *Pierce* with respect to appellate counsel. *See Commonwealth v. Rush*, 576 Pa. 3, 838 A.2d 651, 657–58 (2003); *McGill*, at 1025.

■ Next, appellant asserts the Commonwealth maligned his constitutional rights by denigrating his right to the presumption of innocence. During opening statements, the prosecutor stated:

During this part, understand fully this man came in here presumed innocent. He has a lot of rights. That's our system of government. I'm sure every one of you thinks

back to your elementary school days and took great pride in our system.

* * *

We've come to this stage and when you put those rights out there, the thing that you're here to decide now is what happened on a particular day, and you have just as much of an obligation to be fair to the people of Pennsylvania and Cumberland County as you do to that man right there.

* * *

When you hear the evidence, it's no longer a question of presumed innocent. . . .
You'll say, sir, you got the benefit of every one of those rights, but you don't come up here into this county and shoot a boy and a hard working young lady. . . .

* * *

I have to prove each and every element of these crimes and you'll hear long renditions of what these offenses are and the elements. It's not particularly important now because you are fact finders.

N.T. Trial, 3/12/97, at 2, 3, 11, 12.

▇ The Commonwealth argues the prosecutor was merely explaining what the defendant's constitutional rights were. Commonwealth's Brief, at 27. The PCRA court found the comments did not warrant relief because the trial court instructed the jury as to appellant's rights and presumption of innocence. PCRA Court Opinion, 4/22/02, at 22. Appellant is entitled to a fair trial, not a perfect trial. *See Commonwealth v. Rios,* 554 Pa. 419, 721 A.2d 1049, 1054 (1998) (when reviewing allegations of prosecutorial misconduct, this Court reviews whether defendant received fair trial, not perfect one). We agree with the PCRA court that the comments, viewed in context along with the proper instructions given by the court, do not undermine the truth-determining process and do not require another trial. Appellant asserts his counsel was inef-

fective for failing to raise this issue on direct appeal, but as trial counsel was not ineffective, the claim of appellate counsel's ineffectiveness fails. *See McGill, supra.*

■ Lastly, appellant argues counsel was ineffective for failing to object to irrelevant and improper victim impact testimony and for failing to raise this issue on direct appeal. In his opening, the prosecutor quoted victim's personal advertisement that he was "a single black Christian male." N.T. Trial, 3/12/97, at 7. During direct examination of Tara Hodge, the prosecutor had her read the very same advertisement. In closing, the prosecutor returned to this theme by referring to victims as Christians, stating:

> [Y]ou got to remember being fair to a girl that got shot in the head and to a young man who came to Carlisle in search of a single Christian female and ended up ending his young life in the bottom of that shower.... [T]his young man, this boy, comes into Carlisle, a single black Christian male, a mellow fellow, new to the 'burbs' in search of a single Christian female, loves church, and he did find a nice girl who is working, who did want to be with him, and what did he get?

N.T. Trial, 3/13/97, at 268, 277–78.

Appellant asserts the prosecutor sought to prejudice the jury by injecting religion into the case, seeking to have the jury return a verdict based on sympathy, passion, and prejudice. The Commonwealth claims these comments merely addressed how the victim met Hodge and why he was in her home the night he was murdered. Commonwealth's Brief, at 58. The PCRA court agreed with the Commonwealth, finding the admission of this evidence was "very limited" to the background of the victims and how they met; relief was not warranted. PCRA Court Opinion, 4/22/02, at 25.

The record does not indicate the prosecution was attempting to inject religion into the trial. Even assuming this background information was victim impact testimony, it was so brief it did not affect the jury's decision. *See Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385, 414 (2003) (brief, non-

specific testimony that, prior to her murder, victim was "peaceful" and "nice" constituted victim impact testimony; however, testimony was so fleeting and general, it was not prejudicial); *see also Commonwealth v. Rollins,* 558 Pa. 532, 738 A.2d 435, 447 (1999) (even if considered victim impact evidence, brief testimony that boy was afraid of guns as result of witnessing crime did not prejudice defendant). As appellant fails to prove prejudice, his claim of trial counsel's ineffectiveness fails, *see Basemore, supra,* as does the claim appellate counsel was ineffective. *McGill, supra.*

## JURY CHARGE ISSUE

 Appellant claims trial counsel was ineffective for not objecting to the court's charge, which equated specific intent with malice. Appellant claims the following excerpts from the trial court's charge were confusing and incorrect:

A killing is with malice if it is done with a specific intent to kill.

If the defendant had a specific intent to kill, the killing was malicious.

\* \* \*

 Again, the difference between first degree murder and third degree murder is a specific intent to kill. If a person has a specific intent to kill, as I have defined it, that constitutes malice, and it is the specific intent to kill with malice that raises third degree murder to first degree murder.

If the defendant had a specific intent to kill, it is malicious. If the defendant did not have a specific intent to kill but acted with malice, then a malicious killing without the specific intent to kill is third degree murder.

N.T. Trial, 3/13/97, at 287–88, 304–05. Appellant claims these instructions equated malice with specific intent, thus eliminating the Commonwealth's burden of proving every element of murder.

When evaluating jury instructions, the charge must be read as a whole to determine whether it was fair or prejudicial. The trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration.

*Commonwealth v. Hawkins*, 567 Pa. 310, 787 A.2d 292, 301 (2001).

Recently, this Court addressed a similar instruction on malice, in *Commonwealth v. Overby*, 575 Pa. 227, 836 A.2d 20 (2003). There the trial court instructed the jury on the three mental states of malice and the distinguishing factor between first and third degree murder. *Id.*, at 24 "[F]irst degree murder requires the specific intent to kill. Third degree murder does not require the specific intent to kill." *Id.* (quoting N.T., 7/20/98, at 104). Further, the court instructed the jury, "a killing by a person who has the specific intent to kill is a killing with malice. . . ." *Id.* (quoting N.T., 7/20/98, at 102–03). We concluded the trial court did not err in giving this instruction to the jury. *Id.*

Here, after the initial charge, the jury requested clarification on the difference between first and third degree murder. The trial court explained that each element of first degree murder must be proven beyond a reasonable doubt: "[element] [t]hree, that the killing was with a specific intent to kill. . . . [Element] [f]our, that the killing was with malice." N.T. Trial, 3/13/97, at 302–03.

Contrary to appellant's assertion, after reviewing the charge in its entirety, the instruction adequately and accurately explained the law to the jury. Here, the trial court gave a comprehensive explanation on all the elements of both first and third degree murder in the initial charge, and fully explained them again after the jury requested clarification. These charges, read as a whole, provided ample guidance for the jury's deliberations. Appellant has failed to prove trial counsel was ineffective in failing to object to this charge; as the underlying claim lacks arguable merit, appellate counsel

will not be deemed ineffective for failing to raise this issue on direct appeal. *See McGill, supra.*

## PENALTY PHASE ISSUES

First, Appellant argues that the "in perpetration of a felony" aggravating circumstance, 42 Pa.C.S. § 9711(d)(6),[6] should be limited to the six felonies enumerated in the definition of "perpetration of a felony" at 18 Pa.C.S. § 2502(d). This section defines "perpetration of a felony" as "[t]he act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping." 18 Pa.C.S. § 2502(d). Appellant asserts because he was not found guilty of any of the felonies enumerated in § 2502(d), the jury's finding of the (d)(6) aggravating circumstance cannot stand and trial counsel was ineffective for failing to litigate this claim. This Court addressed and rejected a nearly identical claim in *Commonwealth v. Walker,* 540 Pa. 80, 656 A.2d 90 (1995).

In *Walker,* the appellant asserted the trial court erred in permitting the jury to consider the felony of criminal trespass, 18 Pa.C.S. § 3503(a)(2), as an aggravating circumstance under 42 Pa.C.S. § 9711(d)(6). *Walker,* 656 A.2d at 102. In support of this claim, Walker argued "the legislature did not intend to include criminal trespass among those felonies that may be considered for purposes of determining aggravating circumstances." *Id.* Our Court held a jury may find an "in perpetration of a felony" aggravating circumstance and that felonies are expressly defined in the Crimes Code at 18 Pa.C.S. § 101 *et seq. Id.* Additionally, we held Walker's claim had no merit "[b]ecause 42 Pa.C.S. § 9711(d) expressly permits the use of 'felonies' as an aggravating circumstance...." *Id.* We, therefore, found a jury may consider criminal trespass as a felony

6. 42 Pa.C.S. § 9711(d)(6) provides as follows:
 (d) Aggravating circumstances.—Aggravating circumstances shall be limited to the following:
 (6) The defendant committed a killing while in the perpetration of a felony.

for purposes of the (d)(6) aggravating circumstance. *Id.* Importantly, we did not limit felonies for purposes of (d)(6) to those enumerated in § 2502(d).

Appellant attempts to distinguish his argument from Walker's by providing legislative history to support his claim. According to Appellant, this history suggests that prior to the United States Supreme Court's landmark decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), 18 Pa.C.S. § 2502 and 42 Pa.C.S. § 9711 were part of the same statute. Appellant asserts that following *Furman,* when the Legislature severed the statute into present day Sections 2502 and 9711, it overlooked the necessity to import the definitional subsection of § 2502 into § 9711, which would necessarily include the definition of "perpetration of a felony" in § 2502. We are not persuaded by this argument.

We decided *Walker* on March 23, 1995. Since that time, the General Assembly has amended 42 Pa.C.S. § 9711 on no less than five occasions, including October 11, 1995, November 17, 1995, April 25, 1997, June 25, 1997, and October 12, 1999. 42 Pa.C.S. § 9711. In these amendments, the Legislature did not alter the law as interpreted by this Court. "The failure of the General Assembly to change the law which has been interpreted by the courts creates a presumption that the interpretation was in accordance with the legislative intent; otherwise the General Assembly would have changed the law in a subsequent amendment." *Fonner v. Shandon, Inc.,* 555 Pa. 370, 724 A.2d 903, 906 (1999) (citation omitted); *see* 1 Pa.C.S. § 1922(4)("In ascertaining the intention of the General Assembly ... the following presumptions ... may be used: That when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language."). Accordingly, consistent with our decision in *Walker,* we find that 42 Pa.C.S. § 9711(d)(6) expressly allows a jury to find as an aggravating circumstance that a killing was committed while in perpetration of a "felony." What constitutes a "felony" in this Com-

monwealth is defined in the Crimes Code at 18 Pa.C.S. § 101 *et seq.*

Here, in addition to being found guilty of first degree murder, the jury found Appellant guilty of, among other things, attempted criminal homicide,[7] aggravated assault,[8] and concealing a firearm on his person or in his vehicle without a license.[9] These offenses are felonies; therefore, the jury properly could consider these offenses when determining whether Appellant committed a killing while in the perpetration of a felony for purposes of 42 Pa.C.S. § 9711(d)(6) Accordingly, Appellant's claim lacks merit, and counsel will not be deemed ineffective for failing to litigate a meritless claim. *Commonwealth v. Pursell*, 555 Pa. 233, 724 A.2d 293, 304 (1999).

■ Appellant asserts the prosecutor presented irrelevant, non-statutory aggravating evidence which was incorporated from the guilt phase into the penalty phase, thus undermining the truth-determining process and rendering the sentence unreliable.[10] Additionally, appellant asserts the prosecutor argued his future dangerousness, and that counsel was ineffective for failing to object or ask for a limiting instruction. "Without such instruction, the jury was left without guidance as to the use it could legitimately make of the inflammatory evidence and may have been more inclined, therefore, to sentence [appellant] to death." Appellant's Brief, at 31 (quoting *Commonwealth v. Billa*, 521 Pa. 168, 555 A.2d 835, 842 (1989)).

■ Capital juries are to weigh only the aggravating and mitigating circumstances enumerated in the statute. *See Commonwealth v. Marrero*, 546 Pa. 596, 687 A.2d 1102, 1108 n. 19 (1996) (future dangerousness is not proper aggravating

7. 18 Pa.C.S. §§ 901, 2501, and 2502.

8. 18 Pa.C.S. § 2702(a)(1).

9. 18 Pa.C.S. § 6106.

10. This included evidence which was later found by this Court to be inadmissible at trial. *See Robinson*, at 351 (admission of photographs of appellant with guns that were not the murder weapon, bullet-proof vest, and cartridges from revolver was erroneous).

circumstance and should not be weighed by jury); *see also* 42 Pa.C.S. § 9711. However, a prosecutor must be afforded reasonable latitude in arguing to the jury, and may employ oratorical flair in arguing in favor of the death penalty. *Basemore*, at 869.

The prosecutor did not specifically refer to non-statutory aggravating factors. In his closing, the prosecutor reminded the jury it was to weigh the various aggravating and mitigating circumstances and "that those things that you heard ... during the trial are all part of this process." N.T. Trial, 3/14/97, at 352. The trial court informed the jury to incorporate "[a]ll of the evidence from the Commonwealth and defendant, including the evidence you heard during the first culpability phase of the trial...." *Id.*, at 372. Counsel did not object to this instruction and appellant now claims counsel was ineffective for failing to do so.[11]

This argument is meritless. On direct appeal, this Court concluded the erroneously admitted evidence was harmless. *Robinson*, at 352. This same evidence remains harmless at the penalty phase, as appellant's guilt had already been determined, and the incorporation of this evidence into the penalty stage was purely a procedural matter carried out pursuant to 42 Pa.C.S. § 9711(a)(2). *Id.* ("evidence may be presented as to any other matter that the court deems relevant and admissible on the question of the sentence to be imposed."); *Commonwealth v. Albrecht*, 510 Pa. 603, 511 A.2d 764, 777 (1986).

 Appellant asserts the prosecutor improperly argued his lack of remorse:

> Of all the things that I think you would have maybe said, was, you know, given the argument yesterday, yeah, I did it, I was wrong, you know, where is one sound of I'm sorry, one sound to say something about the memory of this man? None. Well, he tossed it away just like that picture.

11. Appellant also asserts the PCRA court erred in holding the prosecutor's argument "we have to stop" appellant was not a *Simmons* statement. Appellant's Brief, at 32. This argument was addressed on direct appeal and thus was previously litigated. *See* issue 4, *supra*.

N.T. Trial, 3/14/97, at 358. He further contends counsel was ineffective for failing to object and raise this issue on direct appeal. This issue also lacks merit. Reviewed in context, the prosecutor's comments were in response to appellant's opening statement. Here, in his opening statement, appellant, representing himself, pled to the jury *that everything he did was wrong,* he never had a fair chance in life, and he would not receive a fair trial until the jury saw the whole picture. *See* N.T. Trial, 3/12/97, at 12. Contrary to what appellant argues, the prosecutor's comments do not warrant relief, as they were a fair response to appellant's opening. "A remark by a prosecutor, otherwise improper, may be appropriate if it is in fair response to the argument and comment of defense counsel." *Commonwealth v. Trivigno,* 561 Pa. 232, 750 A.2d 243, 249 (2000). As the underlying claim is meritless, appellant's claim appellate counsel was ineffective also fails. *See McGill, supra.*

█ Next, appellant asserts he was denied effective assistance of counsel, because trial counsel failed to investigate and present readily available evidence of his increasingly debilitating paranoid behavior, strong indicia of paranoid schizophrenia, emotional trauma, and history of family dysfunction, all of which affected his behavior on the night of the offenses. We have already determined trial counsel was not ineffective for relying on the reports from the state hospital when appellant's competency was challenged prior to trial. Counsel faced the same reports at the penalty phase. Counsel's stewardship will not be deemed ineffective in pursuing a particular strategy, as long as the course chosen was reasonable. *See Commonwealth v. Rivers,* 567 Pa. 239, 786 A.2d 923, 930 (2001). We agree with the PCRA court that it was not unreasonable for counsel to rely on the same evidence at the penalty phase.

█ Appellant's claim counsel was ineffective for failing to investigate his family background also fails. During the penalty phase, counsel called three witnesses: appellant's mother Juanita Robinson, his Aunt Pearle Mae Williams, and Tara Hodge's mother Pamela Hodge. Mrs. Robinson testified at length as to appellant's family history. The jury learned

appellant's oldest sister was diagnosed with paranoid schizophrenia; his other sister, Deondela, was found dead from an apparent suicide in a hotel room. N.T. Trial, 3/14/97, at 317, 318. She testified further about his academic achievements and military service. *Id.*, at 320–22. Mrs. Williams testified as to the effect Deondela's death had on the family. *Id.*, at 338. Pamela Hodge testified appellant was a "nice boy." *Id.*, at 339.

Additionally, counsel hired a social worker/mitigation expert, Lori Monroe, to investigate appellant's background. Mrs. Monroe testified at the PCRA hearing that appellant was uncooperative and his biggest concern was having someone digging into his family history. N.T. PCRA Hearing, 11/29/01, at 8. Mrs. Monroe testified she was made aware of appellant's family history through interviews with his family members, but chose to forgo the mental health issues as mitigation because he had been determined competent by the State. *Id.*, at 12. Further, she testified appellant's lack of cooperation extended to his family members; she said she believed the family hid a lot of information and was not as forthcoming as they should have been. *Id.*, at 17.

Counsel and Mrs. Monroe developed a reasonable strategy with the information appellant and his family were willing to provide. Counsel presented direct testimony from family members, and used this testimony to paint appellant in the most positive light possible. Counsel will not be deemed ineffective for pursuing a strategy reasonably designed to serve appellant's best interest. *See Rivers, supra.* Accordingly, trial counsel was not ineffective for failing to investigate and present the evidence complained of, and the claim of appellate counsel's ineffectiveness must also fail. *McGill supra.*

■ Appellant argues the prosecutor engaged in an irrelevant, prejudicial, inflammatory line of questioning of his mother that went beyond the scope of direct examination because it failed to deal with the character traits elicited on direct. Appellant asserts trial counsel was ineffective for failing to

object to this cross-examination. Although the PCRA court misconstrued appellant's argument when it concluded it was previously litigated, appellant's issue is meritless.

Appellant called Juanita Robinson to provide information concerning his education, employment background, military service, that he cared for his nieces, and his relationship to his deceased sister. N.T. Trial, 3/13/97, at 316–24. Specifically, appellant challenges the following questions, as to whether Mrs. Robinson was aware:

(1) Appellant had punched a girl while in the military;

(2) Appellant was on probation;

(3) Appellant had a gun at home even though he was not permitted to while on probation;

(4) Appellant had a lock on the door to the room in his home;

(5) Appellant "spent a lot of nights down at the boy['s] home"...;

(6) two years earlier Appellant's father had filed a report with the police alleging that appellant had pulled a gun on him and had assaulted him....;

(7) Appellant was discharged from the army reserves because he was in prison;

(8) Appellant had been arrested for shooting at a girl and convicted of reckless endangerment, assault and battery, and carrying a firearm illegally....

Appellant's Brief, at 95–96.

Appellant may present any evidence "relevant and admissible" to any mitigating circumstance, including any evidence "concerning the character and record of the defendant...." 42 Pa.C.S. § 9711(a)(2) and (e)(8). However, appellant may not offer this evidence in a vacuum without challenge or rebuttal by the Commonwealth. *Commonwealth v. O'Shea*, 523 Pa. 384, 567 A.2d 1023, 1032 (1989). "[C]rossexamination is permissible within the sound discretion of the trial court." *Commonwealth v. Ogrod*, 576 Pa. 412, 839 A.2d 294, 322 (2003). On cross-examination, counsel may question the wit-

ness concerning subjects raised during direct examination, may refute inferences raised during direct testimony, and may attempt to discredit a witness through questions about acts or omissions inconsistent with his testimony. *Id.* The trial court's discretion will not be reversed unless there has been a clear abuse of discretion or an error of law. *Id.*

Here, the prosecutor's cross-examination of Mrs. Robinson was not irrelevant, prejudicial, or inflammatory, as it was an attempt to discredit the witness on appellant's character, which was offered by appellant on direct examination and clearly within the scope of direct. As there is no basis to conclude the trial court abused its discretion, appellant's claim of ineffective assistance of trial counsel is meritless, and his claim appellate counsel was ineffective also fails. *See McGill, supra.*

Lastly, appellant asserts his death sentence should be overturned because the proportionality review conducted by this Court on direct appeal was constitutionally defective. Appellant claims the database relied upon by this Court is fundamentally flawed and inaccurate, violating his liberty interest. Appellant correctly states this Court has rejected this same argument on several occasions. *See, e.g., Commonwealth v. Miller*, 560 Pa. 500, 746 A.2d 592, 604 (2000); *Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693, 708 (1998); *Commonwealth v. Gribble*, 550 Pa. 62, 703 A.2d 426, 438–40 (1997). Appellant fails to offer a compelling reason for this Court to reexamine those decisions, and we decline to revisit this issue.

As appellant's issues have been either previously litigated or meritless, we affirm the denial of post conviction relief. The verdict and sentence of death are affirmed.[12]

Justice BAER files a concurring and dissenting opinion.

Justice NIGRO files a dissenting opinion.

Justice SAYLOR files a dissenting opinion.

12. The Prothonotary of the Supreme Court is directed to transmit the complete record in this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).

Justice BAER, concurring in part and dissenting in part.

I join the Majority opinion as to its resolution of the guilt phase issues.

I, however, join Mr. Justice Saylor's dissenting opinion only as to his conclusion that, in the penalty phase of a capital case, the finding of the "in perpetration of a felony" aggravating circumstance, 42 Pa.C.S. § 9711(d)(6), should be limited to the six felonies enumerated in Section 2502(d) of the Crimes Code, 18 Pa.C.S. § 2502(d). Here, Appellant was never convicted of any of the felonies enumerated in Section 2502(d); therefore, I agree with Mr. Justice Saylor that Appellant's (d)(6) aggravator should be stricken and that Appellant should receive a new penalty phase hearing consistent with this determination.

Justice NIGRO, dissenting.

I join Justice Saylor's dissenting opinion insofar as he (1) takes issue with the majority's analysis of Appellant's claim that trial counsel was ineffective for failing to investigate and challenge Appellant's competency to stand trial, (2) disagrees with the majority's treatment of Appellant's claim with respect to the grave risk aggravator, 42 Pa.C.S. § 9711(d)(7), and instead opines that trial counsel was ineffective for conceding that aggravator under the circumstances of this case, and (3) concludes that the "in perpetration of a felony" aggravator, 42 Pa.C.S. § 9711(d)(6), can only be triggered by one of the six felonies specifically enumerated in Section 2502(d) of the Crimes Code, 18 Pa.C.S. § 2502(d). Moreover, based on the latter two points, like Justice Saylor, I dissent from the majority's ultimate disposition of Appellant's penalty phase claims and would grant Appellant a new penalty phase hearing.

In addition, while I recognize that whether an instruction under *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), was necessary in this case was an issue litigated on direct appeal and thus, the majority finds it to have been previously litigated, I feel compelled to note that I authored a concurring opinion on direct appeal in which

I reiterated my view that a *Simmons* instruction should be given in all capital cases, but nevertheless recognized that a majority of this Court has held otherwise. *Commonwealth v. Robinson*, 554 Pa. 293, 721 A.2d 344, 356 (1998) (Nigro, J., concurring); *see also Commonwealth v. Clark*, 551 Pa. 258, 710 A.2d 31, 43–44 (1998) (Nigro, J., concurring). My view in that regard remains unchanged.

Justice SAYLOR.

I respectfully differ with the majority's approach relative to a number of Appellant's claims in this capital, post-conviction appeal, and I am in a dissenting posture with respect to penalty.

As concerns the claim of trial counsel ineffectiveness in failing to investigate and challenge Appellant's competency to stand trial, I have reservations concerning the degree to which the majority relies on counsel's review of a mental health evaluation prepared by and at the instance of government representatives to support its conclusion of adequate stewardship. *See* Majority Opinion, *op.* at 368–71, 877 A.2d at 439–40. I believe that, in some instances, involvement of a defense expert may be required to assess a capital defendant's mental status, regardless of the Commonwealth's independent determination in this regard. I concur in the majority's disposition on this point because in this case trial counsel did attempt to involve a defense mental health professional in their trial preparations; however, the psychologist's efforts were rebuffed by Appellant, as were the attempts at clinical evaluation made at the post-conviction stage. Thus, Appellant has failed to adequately demonstrate ineffective assistance in the first instance, or prejudice for purposes of post-conviction review.

With regard to the district attorney's argumentation in his opening and closing statements predicated on Appellant's asserted interest in protecting his reputation, *see* Majority Opinion, *op.* at 373–74, 877 A.2d at 442, various of the prosecutor's statements are openly character and propensity-based arguments, which are clearly prohibited under our rules of evidence. *Compare* Pa.R.E. 404(a) (setting forth the general rule

that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion"), *with* N.T., March 12, 1997, at 273 (reflecting commentary of the district attorney, as follows: "Now there was an image projected here, and it's that big city image ... Man, I got to carry a gun wherever I go.... This is the image of a *kind of person* capable of forming the specific intent to kill. *This is a lifestyle.*" (emphasis added)), *and id.* at 277 ("a person who wants to project this kind of image, the kind of guy that has to drive into Cumberland County and have guns in his waistband and his home has to have a bullet proof vest, *those are the kind of guys* I submit to you that say ... disrespect me and you're going to have to pay." (emphasis added)). Furthermore, the prosecutor's references to Appellant's having been from the "big city" and admonition that "you don't come up here into this county and shoot a boy and a hard working girl," are similar (albeit more closely confined to the circumstances at hand in the present case) to the sort of "outsider-based" argumentation that was disapproved by this Court in *Commonwealth v. Malloy,* 579 Pa. 425, 449–54, 856 A.2d 767, 782–84 (2004). On this claim, I am in alignment with the majority's assessment only as to its points concerning the availability of an ineffectiveness challenge in connection with the absence of an objection to the district attorney's opening statement (at which time Appellant was engaged in self-representation), and the reasonable basis and prejudice prongs of the ineffectiveness inquiry relative to the absence of an objection by counsel during the prosecutor's closing. *See* Majority Opinion, at 371–74, 877 A.2d at 441–42.

Next, I have some difficulty with trial court's guilt-phase instructions to the jury concerning the offense of first-degree murder, to the extent that the court equated malice with the specific intent to kill. *See* Majority Opinion, *op.* at 376–78, 877 A.2d at 444. Whereas in most cases there is considerable overlap in the practical application of these concepts, the two are not the same. For example, a killing with malice but without specific intent to kill constitutes third-degree murder, *see Commonwealth v. Thomas,* 552 Pa. 621, 643–44, 717 A.2d

468, 479 (1998); alternatively, depending on the circumstances, a killing with specific intent but without malice may implicate a lesser degree of culpability or complete justification, for example, in the instance of self-defense. *See Commonwealth v. Fowlin*, 551 Pa. 414, 418, 710 A.2d 1130, 1132 (1998). Given such differences, I believe that this Court should require that the essential distinction between specific intent to kill and malice be more carefully observed in jury charges. Nevertheless, as I do not believe that there is a reasonable likelihood that the jurors empaneled at Appellant's trial applied the challenged instruction in a way that violates the Constitution, *see Middleton v. McNeil*, 541 U.S. 433, 436–37, 124 S.Ct. 1830, 1832, 158 L.Ed.2d 701 (2004), or that Appellant was otherwise prejudiced by the instruction, I concur in the majority's disposition of this claim.

With respect to the penalty phase, I find several of Appellant's claims to be of concern, and would award a new penalty hearing as a consequence of at least two.

First, I differ with the majority's assessment concerning the impact of the incorporation of improperly admitted guilt-phase evidence into the penalty hearing. *See* Majority Opinion, *op.* at 380–81, 877 A.2d at 446. In this regard, the majority relies on the analysis from Appellant's direct appeal, to the effect that the trial court's errors in admitting the evidence were harmless. *See id.* at 19. The Court's determination on direct appeal, however, was clearly tethered to guilt-phase impact, as it was expressly predicated on the overwhelming evidence of Appellant's guilt. *See Commonwealth v. Robinson*, 554 Pa. 293, 305–07, 721 A.2d 344, 352 (1998) (discussing the erroneous admission of, *inter alia*, photographs of Appellant with weapons, a bullet-proof vest, and handgun cartridges). Since overwhelming evidence of criminal liability is not dispositive with regard to a capital sentencing jury's determination as between the imposition of a life sentence and a death verdict, I believe that an independent assessment is due concerning the penalty-phase impact of the incorporated, erroneously admitted evidence. In this regard, I believe that the tainted evidence, coupled with the district attorney's character- and propensity-

based arguments (*i.e.*, concerning Appellant's character-based propensity to respond to perceived affronts to his reputation with violence), and express entreaty to the jury to end the violence, N.T., Mar. 14, 1997, at 358 ("And then while he is killing Rashawn another person gets killed. *That's a serious thing that we have to stop[.]*" (emphasis added)), raised the prospect of future dangerousness on Appellant's part that had the potential to color the jurors' eligibility determination.[1]

Second, regarding Appellant's claim of ineffectiveness associated with the jury's finding of the grave-risk aggravator, *see* 42 Pa.C.S. § 9711(d)(7), the majority disposes of the issue on the basis that it was previously litigated on direct appeal by virtue of the Court's sufficiency assessment, and that Appellant has added nothing to this argument in the present, post-conviction proceedings. *See* Majority Opinion, *op.* at 368–69, 877 A.2d at 439. To the contrary, however, Appellant presently contends that his penalty-phase counsel was ineffective for affirmatively conceding the existence of the grave-risk aggravator before the jury. *See* N.T., Mar. 14, 1997, at 367 (reflecting penalty-phase counsel's statement to the effect that "[t]he prosecution's aggravating circumstances are defendant knowingly created a grave risk of death to another person in addition to the victim[;] ... [y]es, he did, and you convicted him of that yesterday."). This claim was not, in fact, addressed by the Court on direct appeal, nor could it have been, since Appellant was represented in his direct appeal by the

---

**1.** Indeed, the prosecutor made the reference to the need to stop Appellant's behavior in connection with his discussion of a specific eligibility criterion, namely, the grave-risk aggravator. *See id.*

Concerning the requirement of an instruction under *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), the Court on direct appeal relied upon authority from this Court to the effect that future dangerous must be expressly implicated by the prosecution to mandate the instruction. *See Robinson*, 554 Pa. at 313–14, 721 A.2d at 355. , It should be noted, however, that the Court's precedent in this regard has since been qualified, if not rejected, by the United States Supreme Court in *Kelly v. South Carolina*, 534 U.S. 246, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002) ("Evidence of future dangerousness under *Simmons* is evidence *with a tendency to prove dangerousness in the future;* its relevance to that point does not disappear merely because it might support other inferences or be described in other terms." (emphasis added)).

same attorneys who represented him at trial. *See Commonwealth v. Green,* 551 Pa. 88, 93, 709 A.2d 382, 384 (1998) (reflecting the general rule that counsel is not permitted to raise his or her own ineffectiveness on appeal).

In my view, it was patent ineffectiveness on the part of counsel to concede the grave-risk aggravator in a situation in which the two victims were shot separately, in different rooms. *Accord Commonwealth v. Stokes,* 532 Pa. 242, 260, 615 A.2d 704, 713 (1992) (plurality) (explaining that the grave-risk aggravator is limited to "situations where the defendant *in the course of killing his particular victim* acts in a manner which endangers the lives of others close in proximity to the intended or actual victim." (emphasis added)). The effect of counsel's concession in terms of inappropriately supplanting the jury's fact-finding function concerning the aggravator seems to me to be little different from the overbroad instruction that was issued by a trial court in *Stokes,* which had effectively directed the jury to find grave risk in a case in which such finding was not a foregone conclusion, and thus required the striking of the aggravator. *See id.* at 259–61, 615 A.2d at 713–14. Additionally, the strategy of defending against the (d)(7) aggravator in the present case was not at all inconsistent with counsel's other apparent strategy, which was to suggest to the jurors that the aggravator should be given less weight than others authorized by the General Assembly, such as the killing of a police officer. *See generally* N.T., Mar. 18, 2004, at 365–66.

Finally, Appellant argues that the in-perpetration-of-a-felony aggravating circumstance found at Section 9711(d)(6) of the Sentencing Code, 42 Pa.C.S. § 9711(d)(6), should be grounded in the statutory definition of "perpetration of a felony" set forth in Section 2502(d) of the Crimes Code, 18 Pa.C.S. § 2502(d), which limits the scope of the term to six, specific felonies, namely, robbery, rape, deviate intercourse by force or threat of force, arson, burglary, and kidnapping. *See id.* The majority treats this argument in a fairly cursory fashion, relying on *Commonwealth v. Basemore,* 525 Pa. 512, 532, 582 A.2d 861, 871 (1990), and *Commonwealth v. Walker,* 540 Pa.

80, 101–02, 656 A.2d 90, 101 (1995). In *Basemore,* however, the felonies underlying the (d)(6) aggravator were burglary and robbery, both of which appear in Section 2506(d), *see Basemore,* 525 Pa. at 517, 582 A.2d at 863, and therefore, the case obviously did not present the issue that is before the Court here, in which Appellant was not convicted of any of the enumerated felonies. While the argument was touched upon in *Walker,* the Court's decision there merely invoked *Basemore's* pronouncement and criticized the appellant's argument because it failed to incorporate the relevant legislative history. *See Walker,* 540 Pa. at 102, 656 A.2d at 101.

Presently, Appellant has provided an extensive legislative history of Section 9711 of the Sentencing Code (the death penalty statute), and Section 2502 of the Crimes Code (the murder statute), together with a well-developed argument that I believe, at a minimum, warrants explicit treatment. At the outset, Appellant acknowledges that Section 2502(d) delimits that the definitions provided there are to be used in connection with that section. *See* 18 Pa.C.S. § 2502(d) ("As used in this section the following words and phrases shall have the meanings given to them in this subsection . . ."). Appellant notes, however, that two of the defined terms ("fireman" and "hijacking") appearing in the same listing as the perpetration-of-a-felony term and definition are not substantively employed in Section 2502, and therefore, that those definitions would be rendered superfluous if Section 2502(d) were not understood as pertinent to the death penalty statute, where all of the terms are expressly used. *See* 42 Pa.C.S. § 9711(d)(1) (defining as an aggravating circumstance, *inter alia,* the killing of a firefighter in the performance of his duties or as a result of his official position);[2] 42 Pa.C.S. § 9711(d)(4) (killing while engaged in hijacking of an aircraft). From a broader frame of reference, Appellant observes that only criminal defendants convicted of first-degree murder may be subjected to the capital sentencing process under Section 9711; however, Section 9711 not itself define first-degree murder. Instead, the

---

**2.** The statute was amended in 1995 to update the term "fireman" to "firefighter." *See* 42 Pa.C.S. § 9711, historical and statutory notes.

definition of first-degree murder is found in Section 2502(a) ("A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing."), which conjoins with another definitional provision of Section 2502(d) (defining "intentional killing" as "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing."). Thus, Appellant observes that the most elemental questions concerning Section 9711 lead inexorably to Section 2502(d)'s definitions, where, just like the definitions for an essential element of first-degree murder, of fireman, and of hijacking, the definition of "perpetration of a felony" is also found, corresponding to Section 9711(d)(6)'s perpetration-of-a-felony aggravator.

According to Appellant, the legislative history is also compelling in demonstrating that Section 2502(d)'s "as used in this section" proviso does not reflect a true legislative design to internalize Section 2502(d)'s definitional provisions, but rather, represents a mere artifact of codification. In this regard, Appellant posits that the drafting history reveals that Sections 2502 of the Crimes Code and 9711 of the Sentencing Code were originally components of a single statutory provision, but became uncoupled based on organizational concerns, a reason having nothing to do with the relevant definitions of first-degree murder and intentional killing, fireman, hijacking, and/or perpetration of a felony.[3] In particular, Appellant

---

3. Appellant notes that the perpetration-of-a-felony criteria were originally designed as elements of first-degree murder, but, in the course of amending and codifying the statute in response to the landmark decision of the United States Supreme Court in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and its progeny, the scheme of codification was altered, and the criteria were dubbed as aggravating circumstances and moved from the substantive offense provision (Section 2502) to a newly proposed section (Section 1311 of the Crimes Code), which was later recodified within Section 9711 of the Sentencing Code. However, the definitions of the terms appearing in those aggravating circumstances—including "fireman," "hijacking" and "perpetration of a felony"—were left behind in Section 2502. Appellant provides a series of examples from the statutory drafting reflecting the evolution of the provisions. *See* HB 884, Session of 1971, Printer's No. 3324, pp. 2–3 (reflecting a proposed mandatory death penalty for any first degree murder that was accompanied by one or more of seven statutory aggravating circumstances, including ones involving the

notes the relative juxtaposition (through the mid–1970's) of the substantive offense provisions of Sections 2502 and the sentencing provisions of Section 1311 of the Crimes Code, predecessor to the present Section 9711 of the Sentencing Code.

In 1977, this Court determined that the revised capital sentencing scheme was unconstitutional, because it limited the jury's consideration of mitigation to three prescribed circumstances. *See Commonwealth v. Moody,* 476 Pa. 223, 382 A.2d 442 (1977). In response, the General Assembly amended Section 1311 of the Crimes Code by adding several mitigating circumstances, including the catch-all mitigator, as well as adding a clause requiring imposition of a death sentence if the jury finds at least one aggravating circumstance and no mitigating circumstances or if the aggravating circumstances outweigh the mitigating circumstances, and the return of a life sentence in all other cases. *See* Act of Sep. 13, 1978, P.L. 756, No. 141, § 1. The 1978 amendments thus brought the capital sentencing scheme into essentially its present-day form. In

perpetration-of-a-felony criteria); HB 700, Session of 1973, Printer's No. 954, at 306 (proposing a mandatory death sentence for all first-degree murders, but defining the offense by reference, *inter alia*, to killing of a fireman, during a hijacking, or in perpetration of a felony, and enumerating the definitions for "fireman," "hijacking" and "perpetration of a felony"); HB 1060, Session of 1973, Printer's No. 1265, at 3–5 (proposing a mandatory death sentence for any first-degree murder conviction, but incorporating into the definition of first-degree murder the types of provisions that are now codified as aggravating circumstances); HB 1060, Session of 1973, Printers No.1958 (proposing a mandatory death penalty for first-degree murder and again incorporating the perpetration-of-a-felony criteria into the definition of the offense of first degree murder, but establishing for the first time mitigating circumstances and detailed provisions for their evaluation in relation to aggravation in capital sentencing, coupled with Senate amendments proposing a bifurcated proceeding in death penalty cases); HB 1060, Session of 1973, Printer's No. 2578 (proposing bifurcation of the procedure for capital sentencing into two phases, and, mechanically, dividing the substantive elements of murder and the sentencing procedure between Sections 2502 and 1311 of the Crimes Code); Act of March 26, 1974, P.L. 213, No. 46 (reflecting the final version of the death penalty statute that was signed into law, embodying Section 2502's prescription for first-degree murder and the definitions of "intentional killing," "fireman," "hijacking," and "perpetration of a felony" as well as Section 1311's separate prescription for aggravating circumstances, including those associated with Section 2502's definitions).

1980, however, the provisions of Section 1311 of the Crimes Code were transferred to their current location at Section 9711. *See* Act of Oct. 5, 1980, P.L. 693, No. 142, § 401(a). Appellant observes that none of these post-*Moody* amendments were in any manner substantively related to the in-perpetration-of-a-felony aggravator or its meaning.

Appellant also argues that a construction of the in-perpetration-of-a-felony aggravator that permits it to be grounded on any felony is in tension with the Eighth and Fourteenth Amendments to the United States Constitution, as they have been interpreted by this United States Supreme Court to require a narrowing process to determine death eligibility. *See Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983) (holding that, to satisfy the constitutional standard derived from *Furman,* an aggravating circumstance "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant as compared to others found guilty of murder."). In this regard, Appellant highlights that all other states having a capital sentencing system in which the sentencer is permitted to consider commission of the killing during the perpetration of a felony in aggravation specifically limit the relevant to discrete, explicitly enumerated groups of felony offenses.[4]

4. *See* Brief of Appellant, at 75–77 n. 57 (citing ALA.CODE § 13A–5–49 (2002) felony aggravators limited to rape, robbery, burglary, kidnapping); A.R.S. § 13–1105 (2002) (felony aggravators limited to sexual conduct with a minor, sexual assault, child molestation, dangerous drug offense, narcotics offense, kidnapping, burglary, arson, robbery, escape, child abuse, unlawful flight from a pursuing law enforcement vehicle, and terrorism); A.C.A. § 5–10–101 (2001) (enumerated violent and/or drug related offenses); CAL.PENAL CODE § 190.2 (2002) (robbery, kidnapping, rape, sodomy, lewd act upon a child, oral copulation, burglary, arson, train wrecking, mayhem, rape by instrument, carjacking); 11 DEL. C. § 4209 (2002) (rape, unlawful sexual intercourse, arson, kidnapping, robbery, sodomy, or burglary); FLA. STAT. § 921.141 (2002), (robbery, sexual battery, aggravated child abuse, abuse of an elderly person or disabled adult, arson, burglary, kidnapping, aircraft piracy, unlawful throwing, placing or discharging of a destructive device or bomb); O.C.G.A. § 17–10–30 (2002) (rape, armed robbery, kidnapping, burglary, arson, aggravated battery); ID. ST. § 18–4003 (2002) (aggravated battery of a child under 12 years of age, arson, rape, robbery, burglary,

kidnapping, mayhem or terrorism); 720 ILCS 5/9–1 (2002) (armed robbery, armed violence, robbery, predatory criminal sexual assault of a child, aggravated criminal sexual assault, aggravated kidnapping, aggravated vehicular hijacking, forcible detention, arson, aggravated arson, aggravated stalking, burglary, residential burglary, home invasion, calculated criminal drug conspiracy); Ind Code § 35–50–2–9 (2002) (arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape, robbery, carjacking, criminal gang activity, drug dealing); K.S.A. § 21–3401 (2002) (flight from an inherently dangerous felony, kidnapping, aggravated kidnapping, robbery, aggravated robbery, rape, aggravated criminal sodomy, abuse of a child, felony theft, burglary, aggravated burglary, arson, aggravated arson, treason, drug felony offenses and criminal discharge of a firearm at a building or vehicle, murder, voluntary manslaughter, aggravated assault, aggravated battery); KRS § 532.025 (2002) (arson, robbery, burglary, rape, sodomy); La C.Cr.P. art 905.4 (2002) (aggravated rape, forcible rape, aggravated kidnapping, second degree kidnapping, aggravated burglary, aggravated arson, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, or simple robbery); Md. Ann. 2–202 (2002) (carjacking, robbery, arson, rape, sexual offense); Mass. St. 279 § 69 (2002) (aggravated rape, rape, assault on a child under 16 years of age with intent to rape, kidnapping for ransom, kidnapping, robbery, breaking and entering with intent to commit a felony, armed assault in a dwelling, arson, confining or putting in fear or otherwise harming another for the purpose of stealing from depositories, or possession of a sawed-off shotgun or machine gun); Miss.Code Ann. § 99–19–101(2002) (rape, sodomy, burglary, robbery, kidnapping, or felony drug offense); Mt. St § 46–18–303 (2002) (sexual assault and that the victim of the sexual assault was less than 18 years of age, kidnapping); Nev Rev.Stat Ann. § 200.033 (2002) (robbery, arson, burglary, invasion of the home or kidnapping, felonies involving the use or threat of violence to the person of another); N.J.S.A. 2C:11–3 (2002) (robbery, sexual assault, arson, burglary, kidnapping, carjacking, criminal escape, or terrorism); N.C. Gen Stat § 15A–2000 (2002) (homicide, robbery, rape, sex offense, arson, burglary, kidnapping, aircraft piracy, unlawful throwing, placing or discharging of a destructive bomb or device); Oh. St 2929.04 (2002) (kidnapping, rape, arson, robbery, burglary); 21 Okl St Ann § 701.7 (2002) (enumerated violent and drug related felonies, forcible rape, robbery with a dangerous weapon, kidnapping, escape from lawful custody, firstdegree burglary, first degree arson, unlawful distributing or dispensing of controlled dangerous substances, or trafficking in illegal drugs); S.C. Code § 16–3–20 (2002) (criminal sexual conduct, kidnapping, burglary, robbery, larceny, poison, drug trafficking, torture); Tenn Code § 39–13–204 (2002) (murder, arson, rape, robbery, burglary, theft, kidnapping, aircraft piracy, unlawful use of bomb); V.T.C.A., Penal Code § 19.03 (2002) (kidnapping, burglary, robbery, aggravated sexual assault, arson, or obstruction or retaliation); Utah Code Ann § 76–5–202 (2002) (aggravated robbery, robbery, rape, rape of a child, object rape, object rape of a child, forcible sodomy, sodomy upon a child, forcible sexual abuse, sexual abuse of a child, aggravated sexual abuse of a child, child abuse, aggravated sexual assault, aggravated arson, arson, aggravated burglary, burglary, aggravated kidnapping, kidnapping, child kidnapping);

The Commonwealth, on the other hand, relies substantially on this Court's *Basemore* and *Walker* decisions. The Commonwealth also advocates a strict, plain meaning approach to Section 2502(d), but gives no account for the fact that an wholly internal treatment of the provision renders several of the defined terms superfluous. According to the Commonwealth, the legislative history is irrelevant. The Commonwealth also notes that several other terms used in Section 9711 contain express cross-references to definitional provisions, thus suggesting that if the Legislature had intended to incorporate Section 2502(d)'s definitions, it would have done so expressly.

In my view, the absence of any substantive import of several of Section 2502(d)'s definitions within Section 2502(d) itself renders the statute ambiguous, *see* 1 Pa.C.S. § 1922(2) (setting forth the presumption that the General Assembly intends the entire statute to be effective and certain), and thus implicates principles of statutory construction, such as reference to the legislative history. *See* 1 Pa.C.S. § 1921(c)(7). In review of that history, it is apparent that, in fashioning the Pennsylvania death penalty statute the General Assembly was responding to constitutional requirements as explained in decisions of the United States Supreme Court dictating the maintenance of carefully defined, narrowing criteria as the threshold to death eligibility. *See* Legis. J.—Senate at 721–23 (June 26, 1978) (setting forth a formal statement of the legislative history surrounding former Section 1311 of the Crimes Code); *see also Zant,* 462 U.S. at 877, 103 S.Ct. at 2742 (elaborating on *Furman's* dictates). Section 2502(d)'s narrowing definition of perpetration of a felony aligns precisely with this approach, and I agree with Appellant that the provision gains full meaning only when read in conjunction

VA.CODE § 18.2–31 (2002) (possession of a deadly weapon, attempted forcible sodomy, forcible sodomy, robbery, attempted robbery, rape, attempted rape, or object sexual penetration); WEST'S RCWA 9A.32.030

with the death penalty statute. The approach of reading Sections 2502 and 9711 in conjunction also comports with this Court's obligation to construe the death penalty statute narrowly. *See* 1 Pa.C.S. § 1928(b)(1); *Commonwealth v. Stallworth,* 566 Pa. 349, 373–74 & n. 7, 781 A.2d 110, 124 & n. 7 (2001). Finally, reading Section 9711 independent of Section 2502(d) also creates the apparent anomaly that the limitation upon felonies eligible for perpetration-of-a-felony status applies to second-degree murder (the definition of which is found within Section 2502), but not to capital sentencing, in which setting the narrowing function is most critical.

Since Appellant was not convicted of a felony enumerated within the statutory definition of perpetration of a felony, I would direct that the (d)(6) aggravator be stricken.[5] Although under my analysis there is a defect connected with both aggravators returned by the jury, I believe that a new penalty hearing is appropriate given the Court's previous finding of sufficient evidence supporting the (d)(7) aggravator (and as the only defect that I have found relative to that aggravator pertains to counsel's deficient stewardship in conceding it).

(2002) (robbery, rape, burglary, arson, or kidnapping); WYO STAT. § 6–2–102 (2002) (robbery, sexual assault, arson, burglary, kidnapping, or abuse of a child).

5. I realize that the claim reaches the Court via the overlay of ineffective assistance of Appellant's trial/direct-appeal counsel for failing to litigate it previously, and I acknowledge the principle that counsel generally are not deemed ineffective for following existing law. As noted, however, the existing law identified a material and curable defect in the arguments that had previously been presented (*i.e.,* the failure to present legislative history), and, I believe that post-conviction counsel has now demonstrated that such history was both available and persuasive.