J-S53021-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| WILLIAM D. CLARK | |
| Appellant | No. 2297 EDA 2016 |

Appeal from the PCRA Order July 13, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0003631-2010

BEFORE:   BENDER, P.J.E., OLSON, J. and FORD ELLIOTT, P.J.E.

MEMORANDUM BY OLSON, J.:                    **FILED OCTOBER 20, 2017**

Appellant, William D. Clark, appeals from the order entered on July 13, 2016, dismissing his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546.  We affirm.

Appellant was arrested in January 2010 and the Commonwealth later charged him with committing rape, involuntary deviate sexual intercourse, and related offenses against his niece, S.P. (hereinafter "Complainant Niece"), and, at a separate information, with committing aggravated indecent assault and related offenses against one of his daughters, S.C. (hereinafter "Complainant Daughter").  On January 3, 2011, the trial court granted the Commonwealth's motion to consolidate the separate informations for trial, pursuant to Pennsylvania Rule of Criminal Procedure 582(A)(1)(a).  Trial Court Order, 1/3/11, at 1.

The case proceeded to a jury trial. Prior to opening statements, the trial court informed the jury that "[s]tatements or arguments made by counsel do not constitute evidence." N.T. Trial, 6/19/13, at 30. The trial court also informed the jury:

> Opening statements, as with any other statements made by counsel, do not constitute evidence and you are not to consider these opening statements as established facts. The only purpose of an opening statement is to give you a general outline of what the case is about so that you will have a better understanding about how each piece of evidence fits in subject, of course, to your evaluation as to its credibility, its accuracy and the weight to be given to it.
>
> You are not to conclude that counsel will necessarily be able to prove what they say they expect to prove nor that the Court will necessarily permit such evidence to be introduced.

*Id.* at 33-34.

During the Commonwealth's opening statement, the Assistant District Attorney ("ADA") summarized the evidence that she intended to introduce at trial. The ADA informed the jury that it would hear testimony from Complainant Daughter, Complainant Daughter's sisters (N.C. and E.C.), and Complainant Niece. As to the anticipated testimony of Complainant Daughter and Complainant Daughter's sisters, the ADA declared:

> As these young women were growing up, their mom and [Appellant's] wife . . . worked full time to provide for the family. She often had the 2:00 p.m. to 10:00 p.m. shift. So after school when the kids were doing their homework and getting ready for bed, . . . [Appellant] was the one in charge of making sure all those things were done. And [Appellant] had certain rules.

- 2 -

One of those rules you will hear throughout the course of this trial involved bathing. Specifically, each of his daughters will testify that when they were finished washing themselves, they were required to call [Appellant], their dad, into the bathroom and they would have to stand there completely naked while [Appellant] checked them. Now, checking them involves several things. It involved him inspecting their bodies to make sure they cleaned themselves properly. Specifically[,] he would inspect their breasts and vaginal areas even after they had gone through puberty and were fully developed. . . .

You'll hear from [Complainant Daughter]. She's the youngest daughter. She'll tell you that she was about 13 when she said to [Appellant], her dad, you know, this is really making me uncomfortable and she'll tell you that she was already fully developed at that point. She had been through puberty. She said, dad, I don't like the way this feels when this happens. And he told her, you know what, I'm your dad. You shouldn't feel like that, and he continued to check her.

She'll tell you that he would inspect her breasts, her buttocks and her vaginal area. He would take his fingers in the wash cloth and actually penetrate her vagina with the wash cloth himself during this checking procedure and after the bath, he would call her into his bedroom and take lotion and while she's still fully naked apply it to her breasts and her buttocks.

You'll also meet [Appellant's] other two daughters, [N.C.] and [E.C.]. They're going to tell you the exact same thing about this bathing and checking procedure and how if they didn't comply with these rules, they'd get in trouble. They'd be on punishment.

Now, [E.C.] will also tell you that [Appellant] did some other things [that] made her uncomfortable. She'll tell you that sometimes her dad would say things that made her feel that way, made her feel uneasy. She remembers one time where [Appellant] would make a comment like, I'm a man. What do you think all you girls going around here teasing me like this? She remembers another time saying, hey dad,

"[y]ou look really nice today" and he responded to her, "what are you going to do about it?"

And she'll even tell you one day she was about 16. She was home sick from school. She's [lying] in bed and watching TV and [Appellant] comes in to check on her. First, he asked her, hey[, how] are you feeling? He starts rubbing her back. He [lies] down behind her in the bed so that his chest is to her back and they're pressed up against one another and she'll tell you she could actually feel his erect penis against her buttocks. And he reached around and started to rub her chest, stomach and reached down over the vaginal area over the clothes, when he got up, got out of the bed, walked out of the room and left.

N.T. Opening Statements, 6/19/13, at 4-8 (some internal capitalization omitted).

With respect to Complainant Niece, the ADA declared during her opening statement:

You're going to meet [Complainant Niece], too. [Complainant Niece] is [Appellant's] and [Appellant's wife's] niece and when she was 15 years old, that summer she went to live with [Appellant] and his wife. . . . She's going to tell you in very vivid detail what happened to her when she was living with this family. She's going to tell you how one morning she woke up and her eyes weren't open yet but she could feel the sun coming through the window on her face.

She remembers exactly what she was wearing. She remembers that she was [lying] face down on her stomach and [Appellant] came in the room. At this point nobody else was home in the household. Mom was at work. Two kids [] at their [grandmother's], one was [at] choir practice. So it's just [Complainant Niece] and [Appellant] alone in the house. And he sits down next to her. Initially innocent. Starts to rub her back and he says, hey, did you sleep well? Did you get a good night's sleep? He continues to rub her back. Then he starts to rub her butt. She's still on her stomach. He takes her by the waist and pulls her to the

edge of the bed and he pulls down his underwear – her underwear, excuse me, and he forces his penis inside her. And she's lying there and she is in shock. This is basically dad to her, too.

And after he was finished, she [lay] there and she's shaking and she's in shock. She doesn't know what to do. And she tells her cousins later on, you know, from now on while I'm sleeping in the morning, if I'm sleeping, wake me up. I'll come with you to choir practice. Just wake me up. Don't let me keep sleeping. But she doesn't tell them. She doesn't put into words what their dad just did to her. So her cousins don't realize why she wants to be woken up, so they forget.

So the very next morning she's sleeping again. Again, [one of Appellant's daughter's] is at choir practice. The two youngest girls are at grandmom's house. It's just [Complainant Niece] and [Appellant] alone in the house. And this time he wakes her up. This time he pulls down his pants and exposes his penis. He takes her head and forces it down to his penis. He won't let up. He's forcing it down, forcing it down. She's trying to get away. He's able to [get] his penis inside her mouth past her lips when she's clenching her teeth. She's clenching them and clenching them trying to prevent his penis from getting any further in her mouth.

When he was finishing having his way with her that time, she runs up the street to the church where [] her cousin[] is finishing choir practice. She's sobbing and [her cousin] looks at her and says, what's wrong? What happened to you? What's going on? She can't bring herself to put into words what happened.

And so when they go home and [Appellant's wife] comes home, she can't bring herself to tell [Appellant's wife] what her husband did to her. And so she tells [Appellant's wife], you know what? I don't want to live here anymore. Send me somewhere else. Send me anywhere else. Send me to DHS. [Complainant Niece] is going to tell you she would have rather lived in the system and lived anywhere else than to spend another moment with [Appellant].

N.T. Opening Statements, 6/19/13, at 8-10 (some internal capitalization omitted).

The ADA concluded her opening statement by summarizing the crimes asserted against Appellant:

> [W]ith respect to [Complainant Niece], the crimes are rape for the allegation that he forced his penis inside her vagina. Involuntary deviate sexual intercourse, which is just a long term for oral sex, because he forced his penis in her mouth, along with sexual assault and unlawful contact with a minor.
>
> For [Complainant Daughter,] he's charged with indecent assault of a child under 13, endangering the welfare of a child and unlawful contact with a minor.
>
> Now, even though you don't have to render a verdict with respect to [N.C.] and [E.C.], you will hear from them as well. And you'll hear from them and you'll hear their testimony as a way to help you understand [Appellant's] intent, his motive, his [M.O.], his plan and that will help you understand what life was like for these girls and the way that [Appellant] acted.

*Id.* at 11.

During the evidentiary portion of the trial, the Commonwealth presented the testimony of Complainant Daughter and her sisters, N.C. and E.C. Further, Complainant Daughter and her sisters testified consistently with the ADA's representation of their testimony, as made in the ADA's opening statement. *See* N.T. Trial, 6/20/13, at 13-17, 22-24, 31, and 34 (regarding N.C.'s testimony); N.T. Trial, 6/20/13, at 43-47 and 51-52 (regarding E.C.'s testimony); and, N.T. Trial, 6/20/13, at 85-89, 91-97, and 107 (regarding Complainant Daughter's testimony).

During Appellant's cross-examination of Complainant Daughter and her sisters, Appellant's counsel postulated that Appellant's bathing ritual and his actions in that regard were done not to arose sexual desire in Appellant, but were done for purely "hygienic" reasons – where Appellant was merely "checking [his daughters] to make sure [they] were clean." *See*, *e.g.*, N.T. Trial, 6/20/13, at 34-35, 57-58, and 98. In furtherance of this defense, Appellant's counsel brought forth testimony from Complainant Daughter or her sisters that: during the bathing ritual, Appellant was always clothed; Appellant never said anything of a sexual nature during the bathing ritual; Appellant's actions were not secret and the bathing ritual occurred while his wife and guests were present in the house; and, while the ritual was occurring, all three sisters believed that the purpose of the ritual was simply "to make sure [they] were clean." *See*, *e.g.*, N.T. Trial, 6/20/13, at 26, 31-32, and 34-35 (regarding N.C.'s testimony); N.T. Trial, 6/20/13, at 58, 59, and 60 (regarding E.C.'s testimony); N.T. Trial, 6/20/13, at 97 and 98 (regarding Complainant Daughter's testimony).

At the beginning of the third day of trial, the ADA informed Appellant and the trial court that she was "not going to be able to proceed with" the case related to Complainant Niece.[1] N.T. Trial, 6/21/13, at 4. Appellant

---

[1] After the trial court granted Appellant's motion for judgment of acquittal, the ADA informed the trial court that she was prepared to call a witness who would testify that Complainant Niece could not testify at trial because "she's suffering from severe panic attacks, the emotional distress, that she just

*(Footnote Continued Next Page)*

then moved for, and the trial court granted, a judgment of acquittal on the charges related to Complainant Niece. *Id.* at 4-5. Afterwards, Appellant, the ADA, and the trial court spoke about how to inform the jury that it would not be hearing any evidence relating to Complainant Niece. The conversation proceeded as follows:

> [ADA McNabb]: I would ask or ask the Court how we want to handle it with the jury. Should we just tell them they're not to consider anything relating to her?
>
> [Trial Court]: Well, I mean, they don't have any evidence with regard to her. So they will be instructed that as to the charges and the only complainant they're dealing with at this point in time is the other complainant.
>
> [ADA McNabb]: Okay.
>
> [Appellant's Counsel]: And, Your Honor, in my closing may I address the issue of what she argued she was going to present and that she has not presented because that was part of my opening. Not to belabor the issue but I'm just –
>
> [ADA McNabb]: I think with respect to [Complainant Daughter] if she feels – if counsel feels I have not met my burden, that's fair game. But without me being able to put on evidence as to why she's not testifying from the rest of her family, it's a little unfair to say she can't prove it. You know the jury is left wondering and speculating.

*(Footnote Continued)* ───────────────

can't relive it, that she's terrified of testifying again." N.T. Trial, 6/21/13, at 13-14; *see also* N.T. Sentencing, 10/1/13, at 23 ("I would just remind the [trial c]ourt that we started out with mandatory minimums and we started out with felony in the first degree. And the reason we could not proceed with those charges was because of the dramatic effect those crimes had on [Complainant Niece]. She had a panic attack so bad that we couldn't even proceed with her testimony").

> I think the best way to handle it is to instruct them that you're not to wonder or speculate or concentrating on the evidence you didn't hear.
>
> [Appellant's Counsel]: Well, can I say this? I'm not making reference to the particular complainant. I'm making reference to her arguments that she made in her opening with regards to you're going to hear this home wasn't safe. There was penetration. They didn't hear any of that. That's my argument. I'm not going to make reference to this particular complainant. But to some of the arguments that she made to the jury what she promised to deliver that she has not delivered I would like to be able to address.
>
> [Trial Court]: Let me think about it.

*Id.* at 5-6.

The trial court ruled that, during closing argument, Appellant's counsel was permitted to "comment in general on the Commonwealth's failure to meet its burden but we're not going to get into the specifics." *Id.* at 17. Further, as is evident from the above, Appellant's counsel did not request a mistrial or a specific curative instruction related to the Commonwealth's opening statement, where the ADA spoke about Appellant's alleged rape and involuntary deviate sexual intercourse of Complainant Niece. *See id.* at 5-6.

The trial court did not specifically instruct the jury on anything related to what the ADA declared, in her opening statement, as to Complainant Niece. However, during the trial court's charge to the jury, the trial court again informed the jury that the verdict must be based upon the evidence presented and not upon the statements or arguments of counsel. *See*, *e.g.*, *id.* at 21-22.

During Appellant's closing argument, Appellant's counsel reminded the jury that – in contravention of the ADA's opening statement – the Commonwealth had failed to present any evidence related to Complainant Niece. Appellant's counsel argued to the jury:

> As you recall, when I spoke to you in my opening, I indicated to you what the Commonwealth said to you was not in evidence. I also told you to keep an open mind because I indicated to you that everything the Commonwealth said to you would have to be proven by the witnesses who took the stand.
>
> You've heard all the evidence. Do you recall in the Commonwealth's opening where she described how these children you were going to hear they were feeling unsafe at home. You were going to hear about this rape, this penetration and all of these things. That's what the Commonwealth told you she was going to prove to you.
>
> What she proved to you was what you heard on the witness stand. Nothing that she said to you in her opening is admitted into evidence. You are the fact finders and that's why I asked you at the beginning of this case to keep an open mind, because clearly her opening arguments to you had much more than what she brought to you in this courtroom. So I'm now going to talk to you about the evidence that she brought to you in this courtroom because that's the only thing that you are to consider when you go back to deliberate. It's not what she said. It's not what I said. It's what the witnesses said. You are the fact finders. You have to make the determination what happened in this case. So let's talk about the [] evidence now that you [] have the evidence. . . .

Appellant's Closing Argument, 6/21/13, at 5-6.

The jury found Appellant guilty of indecent assault of a child less than 13 years of age, endangering the welfare of a child, and unlawful contact with a minor.[2] On October 1, 2013, the trial court sentenced Appellant to serve an aggregate term of 40 months to ten years in prison, followed by seven years of probation, for his convictions. N.T. Sentencing, 10/1/13, at 36-37. Appellant did not file a direct appeal from his judgment of sentence.

On July 31, 2014, Appellant filed a timely, *pro se* PCRA petition. The PCRA court appointed counsel to represent Appellant during the proceedings and, on March 14, 2016, counsel filed an amended PCRA petition on Appellant's behalf. **See** Amended PCRA Petition, 3/14/16, at 1-3. Within the amended petition, Appellant claimed that trial counsel was ineffective for failing to "move for a mistrial or other instruction from the judge," after the Commonwealth informed the trial court that it could not proceed on the charges related to Complainant Niece and after the trial court granted Appellant's motion for a judgment of acquittal on those charges. **Id.** at 3. Specifically, Appellant declared:

> the trial in question involved the joinder of two separate cases . . . involving two separate complainants ([Complainant Daughter and Complainant Niece]). During opening statements, the prosecutor made detailed allegations about an indecent assault alleged to have been committed against [Complainant Daughter] and an alleged rape committed against [Complainant Niece]. [Complainant Niece] never testified at trial and the Commonwealth never

---

[2] 18 Pa.C.S.A. §§ 3126(a)(7), 4304(a), and 6318(a)(1), respectively.

offered any evidence about this offense. As a result, a judgment of acquittal was ultimately granted as to [the charges related to Complainant Niece]. Notwithstanding the jury's receipt of extremely prejudicial information, trial counsel did not move for a mistrial or other instruction from the judge. As a result, there are serious doubts that [Appellant] actually received a fair trial.

*Id.*

On June 10, 2016, the PCRA court provided Appellant with notice that it intended to dismiss the PCRA petition in 20 days, without holding a hearing. *See* PCRA Court Order, 6/10/16, at 1; Pa.R.Crim.P. 907(1). The PCRA court finally dismissed Appellant's PCRA petition on July 13, 2016 and Appellant filed a timely notice of appeal. Appellant raises two claims on appeal:

> 1. Whether the PCRA court erred when it dismissed [Appellant's] petition without first holding an evidentiary hearing on the factual dispute(s) noted by the Commonwealth in its motion to dismiss?
>
> 2. Whether the PCRA court erred when it dismissed [Appellant's] petition as meritless where [Appellant] raised a meritorious claim of ineffective assistance of counsel in connection with his attorney's election against moving for a mistrial after the jury heard extensive opening remarks pertaining to an unsubstantiated rape and the Commonwealth failed to offer any evidence of the same during trial?

Appellant's Brief at 8 (some internal capitalization omitted).

To be eligible for relief under the PCRA, the petitioner must plead and prove by a preponderance of the evidence that his conviction or sentence resulted from "one or more" of the seven, specifically enumerated circumstances listed in 42 Pa.C.S.A. § 9543(a)(2). One of these statutorily

enumerated circumstances is the "[i]neffectiveness of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9543(a)(2)(ii).

Counsel is, however, presumed to be effective and "the burden of demonstrating ineffectiveness rests on [A]ppellant." ***Commonwealth v. Rivera***, 10 A.3d 1276, 1279 (Pa. Super. 2010). To satisfy this burden, Appellant must plead and prove by a preponderance of the evidence that:

> (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and, (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the challenged proceedings would have been different.

***Commonwealth v. Fulton***, 830 A.2d 567, 572 (Pa. 2003). As this Court has explained:

> A claim has arguable merit where the factual averments, if accurate, could establish cause for relief. ***See Commonwealth v. Jones***, 876 A.2d 380, 385 (Pa. 2005) ("if a petitioner raises allegations, which, even if accepted as true, do not establish the underlying claim . . . , he or she will have failed to establish the arguable merit prong related to the claim"). Whether the facts rise to the level of arguable merit is a legal determination.
>
> The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be considered reasonable if they effectuated his client's interests. We do not employ a hindsight analysis in

comparing trial counsel's actions with other efforts he may have taken.

Prejudice is established if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Commonwealth v. Stewart*, 84 A.3d 701, 707 (Pa. Super. 2013) (some internal quotations and citations omitted). "A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim." *Id.*

Moreover, we note that a PCRA petitioner is not automatically entitled to an evidentiary hearing on his petition. Specifically, a PCRA petition may be dismissed without a hearing if the PCRA court "is satisfied from [its review of the petition] that there are no genuine issues concerning any material fact and that the [petitioner] is not entitled to post-conviction collateral relief, and no purpose would be served by any further proceedings." Pa.R.Crim.P. 907(1). However, when the PCRA petition raises material issues of fact, the PCRA court "shall order a hearing." Pa.R.Crim.P. 908(A)(2). Thus, "[t]o obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing." *Commonwealth v. Paddy*, 15 A.3d 431, 442 (Pa. 2011) (internal quotations and citations omitted).

On appeal, Appellant claims that the PCRA court erred when it dismissed his petition without holding a hearing. According to Appellant, there is a genuine issue of material fact that his trial counsel was ineffective for failing to request a mistrial after it was discovered that – in contravention of the ADA's declarations in her opening statement – Complainant Niece refused to testify and the Commonwealth presented no evidence related to the alleged rape or involuntary deviate sexual intercourse of Complainant Niece.[3] We disagree with Appellant.

"A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." *Commonwealth v. Bryant*, 67 A.3d 716, 728 (Pa. 2013) (internal citations and corrections omitted). "A mistrial is an extreme remedy that is required only where the challenged event deprived the accused of a fair and impartial trial." *Commonwealth v. Smith*, 131 A.3d 467, 474–475 (Pa. 2015) (internal quotations and citations omitted).

As our Supreme Court has held:

_____

[3] Within Appellant's brief to this Court, Appellant argues only that counsel was ineffective for failing to request a mistrial. *See* Appellant's Brief at 8-40. Therefore, Appellant has waived any claim that counsel was ineffective for failing to request a curative instruction. *Commonwealth v. Spotz*, 716 A.2d 580, 585 n.5 (Pa. 1999) ("[the Pennsylvania Supreme Court] has held that an issue will be deemed to be waived when an appellant fails to properly explain or develop it in his brief").

> Remarks in a prosecutor's opening statement must be fair deductions from the evidence which [s]he in good faith plans to introduce and not mere assertions designed to inflame the passions of the jury. The prosecution is not, however, required to prove conclusively all statements made during the opening [statement]. As long as there is a good faith and reasonable basis to believe that a certain fact will be established, reference may properly be made to it during the opening [statement]. Even if an opening [statement] is improper, relief will be granted only where the unavoidable effect is to so prejudice the finders of fact as to render them incapable of objective judgment.

*Commonwealth v. Jones*, 610 A.2d 931, 938-939 (Pa. 1992).

In this case, Appellant admits that, when the ADA gave her opening statement, the ADA had a good faith belief that she would call Complainant Niece as a witness at trial and that Complainant Niece would testify consistently with the ADA's representations, as made in the opening statement. *See* Appellant's Brief at 21 n.4 and 27 n.5. Therefore, to the extent Appellant bases his ineffective assistance claim upon an allegation of prosecutorial misconduct, Appellant's ineffective assistance claim fails, as the underlying claim lacks arguable merit. *Jones*, 876 A.2d at 385 ("if a petitioner raises allegations, which, even if accepted as true, do not establish the underlying claim . . . , he or she will have failed to establish the arguable merit prong related to the claim").

Nonetheless, Appellant claims on appeal that – even though the ADA acted in good faith during her opening statement – counsel was still ineffective for failing to request a mistrial when Complainant Niece refused to testify and a judgment of acquittal was entered on the charges relating to

Complainant Niece. Appellant claims that the "subsequent, unforeseen events" that occurred in this case necessitated a mistrial because "the jury heard the [ADA] describe the lurid details of an alleged rape during [her] opening statement" and, yet, "[n]o witness was presented to establish these allegations during trial." Appellant's Brief at 21. According to Appellant, when the jury heard about the alleged rape he committed against Complainant Niece, the jury was prejudiced against him in regard to the charges related to Complainant Daughter – and in regard to his defense that the bathing ritual was not sexual, but was merely hygienic in nature.

"Courts are hesitant to grant a motion for a mistrial when the conduct complained of was not the product of the court, counsel, or the parties." **Commonwealth v. Metzer**, 634 A.2d 228, 232 (Pa. Super. 1993) (internal quotations and citations omitted). Nevertheless, we recognize that "some remarks [] in an opening or closing statement could be so prejudicial that a finding of error, or even constitutional error, would be unavoidable." **Frazier v. Cupp**, 394 U.S. 731, 736 (1969). For example, in **Commonwealth v. Wilson**, 402 A.2d 1027 (Pa. 1979), the defendant was on trial for murder and, during the opening statements, the Commonwealth "told the jury of [the defendant's] incriminating statements following his arrest and quoted from the [defendant's] written [confession]." **Id.** at 1028. However, the Commonwealth did not introduce the defendant's confession into evidence during the jury trial. **Id.**

On appeal, the defendant claimed that the reference to the confession during opening statements deprived him of a fair trial. *Id.* The Commonwealth countered by arguing that "the assistant district attorney was acting in good faith during his opening presentation to the jury and intended as of that moment to make evidentiary use of [the defendant's] confession, but changed his mind as the trial progressed." *Id.* at 1029 (internal quotations omitted). The Pennsylvania Supreme Court agreed with the defendant and held that, even if the Commonwealth acted in good faith during the opening statement, the Commonwealth's reference to the confession during opening statements deprived the defendant of a fair trial and, thus, entitled the defendant to a new trial. *Id.* The *Wilson* Court explained:

> If a confession is introduced into evidence at trial, the accused has the right to cross-examine those who verify it as to the circumstances and contents. He may also question its accuracy and even deny making it. Here, [the defendant] was denied the opportunity of making any inquiry as to the confession, its contents or circumstances even though the jury was effectively made aware that he had confessed and that he had "signed a written confession, signed it on each and every page of the confession, and his father signed the confession at the end." Additionally, the jury was told by the assistant district attorney that [the defendant] had lied and tried to mislead the police as to the gun. All of this was without support in the record.
>
> The most devastating evidence against one accused of crime is a confession or admission of guilt. This case is no exception. Even instructions such as were given here by the court to the jury cautioning that they should dismiss the statement from "your mind" and let it not "enter into your deliberations" could not erase the impact of having the jury

> know [the defendant] had confessed.  Any person conversant with the mental process of a jury in determining the guilt or innocence of an accused would be hard put to honestly deny this.

> The Commonwealth urges that the assistant district attorney was acting in good faith during his opening presentation to the jury and intended as of that moment to make evidentiary use of [the defendant's] "confession," but changed his mind as the trial progressed.  Suffice it to say, the good faith of the prosecuting official does not lessen the prejudice suffered by [the defendant].

*Id.* at 1029.

From this Court's research, **Wilson** is unique in Pennsylvania jurisprudence – it is the only case, that we have found, where a district attorney's good faith reference to a matter in an opening statement necessitated a mistrial, when the district attorney later failed to introduce the stated evidence at trial.[4]  Further, we believe that the lack of precedent supporting Appellant's position is for good reason.  In short, it is the combination of the fact that:  the trial court routinely and repeatedly instructs the jury that opening statements are not evidence; the trial court also instructs the jury that its verdict must be based upon the evidence presented and not upon the statements or arguments of counsel; under our precedent, "[t]he jury is presumed to have followed the [trial] court's instructions;"[5] and, as the United States Supreme Court has explained,

---

[4] Appellant has cited to no such case; indeed, within Appellant's brief to this Court, Appellant did not even cite to or discuss **Wilson**.

[5] **Commonwealth v. Flor**, 998 A.2d 606, 632 (Pa. 2010).

"[m]any things might happen during the course of the trial which would prevent the presentation of all the evidence described in advance. . . . [N]ot every variance between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given." *Frazier*, 394 U.S. at 736. Simply stated, *Wilson* stands apart because, in *Wilson*, the district attorney read **the defendant's own confession to the jury** during opening statements – and, as the Supreme Court explained, the "most devastating evidence against one accused of crime is a confession or admission of guilt." *Wilson*, 402 A.2d at 1029.

Indeed, in *Frazier*, the defendant was on trial for murder and the prosecution expected to call the defendant's co-conspirator, Jerry Lee Rawls, to testify against the defendant at trial. *Frazier*, 394 U.S. at 733. As the Supreme Court explained:

> after the trial began the prosecutor included in his opening statement a summary of the testimony he expected to receive from Rawls. The summary was not emphasized in any particular way; it took only a few minutes to recite and was sandwiched between a summary of [the defendant's] own confession and a description of the circumstantial evidence the State would introduce. At one point the prosecutor referred to a paper he was holding in his hands to refresh his memory about something Rawls had said. Although the State admitted in argument here that the jury might fairly have believed that the prosecutor was referring to Rawls' statement, he did not explicitly tell the jury that this paper was Rawls' confession, nor did he purport to read directly from it.

*Id.* at 733-734.

During trial, Rawls was called as a witness and he informed the trial court that he intended to assert his privilege against self-incrimination to every question concerning his activities on the day of the murder. Rawls was then dismissed from the witness stand. *Id.* at 734.

Before the United States Supreme Court, the defendant claimed that the prosecutor's reference to Rawls' confession during opening statements deprived him of a fair trial. The Supreme Court disagreed and held:

> it is clear that this case is quite different from either *Douglas* [*v. Alabama*, 380 U.S. 415 (1965)] or *Bruton* [*v. United States*, 391 U.S. 123 (1968)]. In *Douglas*, the prosecutor called the defendant's coconspirator to the stand and read his alleged confession to him; the coconspirator was required to assert his privilege against self-incrimination repeatedly as the prosecutor asked him to confirm or deny each statement. The [Supreme] Court found that this procedure placed powerfully incriminating evidence before the jury in a manner which effectively denied the right of cross-examination. Here, Rawls was on the stand for a very short time and only a paraphrase of the statement was placed before the jury. This was done not during the trial, while the person making the statement was on the stand, but in an opening statement. In addition, the jury was told that the opening statement should not be considered as evidence. Certainly the impact of the procedure used here was much less damaging than was the case in *Douglas*. And unlike the situation in *Bruton*, the jury was not being asked to perform the mental gymnastics of considering an incriminating statement against only one of two defendants in a joint trial. Moreover, unlike the situation in either *Douglas* or *Bruton*, Rawls' statement was not a vitally important part of the prosecution's case.
>
> We believe that in these circumstances the limiting instructions given were sufficient to protect petitioner's constitutional rights. As the [Supreme] Court said in *Bruton*, "Not every admission of inadmissible hearsay or

other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently." It may be that some remarks included in an opening or closing statement could be so prejudicial that a finding of error, or even constitutional error, would be unavoidable. But here we have no more than an objective summary of evidence which the prosecutor reasonably expected to produce. Many things might happen during the course of the trial which would prevent the presentation of all the evidence described in advance. Certainly not every variance between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given. Even if it is unreasonable to assume that a jury can disregard a coconspirator's statement when introduced against one of two joint defendants, it does not seem at all remarkable to assume that the jury will ordinarily be able to limit its consideration to the evidence introduced during the trial. At least where the anticipated, and unproduced, evidence is not touted to the jury as a crucial part of the prosecution's case, it is hard for us to imagine that the minds of the jurors would be so influenced by such incidental statements during this long trial that they would not appraise the evidence objectively and dispassionately.

*Id.* at 735-736 (some internal quotations and citations omitted) (internal footnote omitted).

In the case at bar, it is uncontradicted that: the ADA acted in good faith when, during her opening statement, she described Appellant's alleged rape and involuntary deviate sexual intercourse of Complainant Niece; through no fault of "the court, counsel, or the parties," the Commonwealth was prevented from introducing the evidence related to Complainant Niece;[6]

---

[6] *See Metzer*, 634 A.2d at 232.

- 22 -

Appellant was granted a judgment of acquittal on the charges related to Complainant Niece; the allegations and statements related to Complainant Niece were confined to the ADA's opening statement and were never heard again during trial or during the Commonwealth's closing arguments; and, the trial court repeatedly instructed the jury that opening statements are not evidence and that the jury's verdict must be based upon the evidence presented and not upon the statements or arguments of counsel. Moreover, we note that the allegations related to Complainant Niece were "not touted to the jury as a crucial part of the prosecution's case" against Appellant as to the charges that actually went to the jury – those with respect to **Complainant Daughter**.

Under these facts, we conclude that Appellant was not entitled to a mistrial after it was discovered that the Commonwealth could not proceed on the charges related to Complainant Niece. Appellant's trial – though not perfect – was not unfair. ***Commonwealth v. Robinson***, 877 A.2d 433, 443 (Pa. 2005) ("[a]ppellant is entitled to a fair trial, not a perfect trial"); ***Frazier***, 394 U.S. at 735 ("[n]ot every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently") (internal quotations and citations omitted). Appellant's ineffective assistance of counsel claim thus lacks

arguable merit. As such, we conclude that the PCRA court did not err when it dismissed Appellant's PCRA petition without holding a hearing.[7]

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/20/2017

---

[7] We have concluded that the PCRA court did not err when it dismissed Appellant's petition without holding a hearing. Therefore, Appellant's second numbered claim on appeal (wherein he claims that he is entitled to post-conviction collateral relief as a matter of law) fails.