J-S13035-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ROSE MARIE LIMULI | : | |
| | : | |
| Appellant | : | No. 565 EDA 2020 |

Appeal from the PCRA Order Entered January 15, 2020
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s):  CP-46-CR-0004644-2016

BEFORE:  OLSON, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED JUNE 16, 2021**

Rose Marie Limuli (Limuli) appeals from the January 15, 2020 order of the Court of Common Pleas of Montgomery County (PCRA court) dismissing her petition for relief pursuant to the Post-Conviction Relief Act without a hearing.[1]  Limuli argues that trial counsel was ineffective because he failed to question two of her character witnesses regarding her reputation for chastity, good morals and decency.  We affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 9541 *et seq.*

**I.**

**A.**

We glean the following facts from the certified record. During the 2015 to 2016 school year, Limuli was an English teacher at Upper Dublin High School. In 2016, she was charged with twelve counts of institutional sexual assault[2] based on an illicit sexual relationship she engaged in with N.R., an 18-year-old senior at the school.

At trial, N.R. testified that at the beginning of the school year, he began spending free time throughout the school day in Limuli's classroom even though he was not in her class. He said that he developed a friendly relationship with her and eventually she entered her Snapchat[3] username in his phone. They began to talk via text message and Snapchat. N.R. said Limuli soon began purchasing gifts for him, including clothing, sneakers, sports equipment, alcohol and food.

After she began buying him these gifts, Limuli started making comments that she "wanted something in return" or "want[ed] it," which N.R. believed meant that she was seeking something sexual. Notes of Testimony, 2/21/17, at 44-45. He said that she also gripped his penis through his pants on multiple

___

[2] 18 Pa.C.S. § 3124.2(a.2)(1).

[3] Snapchat is a social media application that allows users to send each other messages that are automatically deleted after a short period of time.

occasions when he was sitting in the back of her classroom. In November 2015, Limuli gave N.R. a ride home after school. Before taking him home, she drove to a nearby dog park and performed oral sex on him in her car in the parking lot. N.R. testified that the oral sex occurred on at least ten occasions over several months, usually in the parking lot at the dog park. In January 2016, Limuli drove to N.R.'s home to give him some baseball bats that she had purchased for him. N.R. testified that on that occasion, they had sexual intercourse in his house.

Throughout this period of time, Limuli continued to purchase gifts for N.R. He would send her links to items and she would purchase them online. Eventually she gave N.R. her credit card information and he began making purchases on his own. N.R. testified that she bought things for him every week and would ask what she would be getting in return. Over the winter break, Limuli took N.R. shopping at the Limerick Outlet stores and purchased items for him from True Religion, Nike and the liquor store near his home. He said that he continued seeing Limuli because he wanted her to keep buying things for him.

The Commonwealth presented copies of text messages between N.R. and Limuli. One message N.R. sent to Limuli read "I need some grub. I didn't eat dinner last night." *Id.* at 50. Limuli responded "I need something to eat after school, too…" followed by a smiley face emoji. *Id.* at 50-51. In other messages, Limuli wrote "I need you today…" and "Come on baby, you know I

love you." *Id.* at 53-54. In December 2015, Limuli purchased a dirt bike for N.R. for $930. Thereafter, she sent him a text message that read "You know I have a life outside of getting stuff for you all the time. Will I see you after detentions?" *Id.* at 59. When N.R. responded that he could not see her that day, Limuli replied "Dude you're killing me. It's all want want with you. Remind me again why I ordered you a freaking bike." *Id.* at 59-60. The Commonwealth introduced other text messages in which Limuli and N.R. discussed purchases that he had made with her credit card and N.R. asked Limuli for money and various items.

N.R. testified that the relationship continued until March or April 2016 but eventually there were rumors at school regarding his involvement with Limuli. He denied the allegations when speaking with his friends and during his first interview with Detective Michael Scarpato (Detective Scarpato). He testified that at first, he did not want to get Limuli in trouble, but then she told him that she intended to tell her family or her attorney that N.R. had blackmailed her into making all the purchases. At that point, N.R. went to the police station and disclosed the relationship to Detective Scarpato. N.R. had deleted many of his messages with Limuli from his phone but he gave Detective Scarpato the phone so that they could review it for evidence.

Limuli cross-examined N.R. at trial regarding discrepancies between his testimony at an earlier *habeas corpus* hearing, his initial statement to Detective Scarpato and his trial testimony. He admitted that he lied to his

friends and to Detective Scarpato about the relationship but said that Limuli had asked him not to tell anyone. N.R. did not recall the specific dates for any of the sexual conduct and offered conflicting testimony regarding how many encounters there were throughout the months of November 2015 through April 2016. N.R. admitted to sending derisive messages about Limuli to friends and to labeling her as "Fat Turkey" in the contacts on his phone. *Id.* at 84, 90-93, 113-15. After N.R. spoke with police, he texted Limuli's credit card information to several friends and asked them to save it so he could continue to make purchases after the police took his phone.

Detective Scarpato testified regarding his investigation. He confirmed that N.R. denied the relationship in their first conversation but said he did not think N.R. was telling the truth at the time because he was acting "very scared and very nervous." *Id.* at 121. Detective Scarpato extracted data from N.R.'s phone and found 276 contacts between N.R.'s phone and Limuli's phone. Consistent with N.R.'s testimony, there were contacts during Thanksgiving break and winter break. Detective Scarpato obtained information from Snapchat that revealed that N.R. and Limuli exchanged hundreds of messages on that application. He also obtained statements from Limuli's credit card company that corroborated N.R.'s testimony regarding the purchases Limuli made for him, including the charge for the dirt bike and the purchases over the winter break at the outlet stores.

Detective Scarpato obtained a search warrant to extract data from Limuli's phone and discovered many of the same messages. He found that Limuli had saved N.R.'s number in her contacts as "Brenda." *Id.* at 150-51. Thousands of messages had been deleted from the phone. He discovered messages Limuli sent to another student at Upper Dublin High School which read "Why are you sending me a snap of [N.R.]? I get no love tonight. I thought we were all go [sic] out tonight." Notes of Testimony, 2/22/17, at 29. She also wrote "I'm clubbing with the girls…I need something," "You guys wanna be with the little girls," and "Is my boy [N.R.] being good." *Id.*

In another exchange with N.R., Limuli asked him to delete a Snapchat message from her that he had saved on his phone. When he refused, she wrote, "Thank you so much for making me sick to my stomach and throw up with anger and disgust at myself for thinking that when someone shows love, you get love in return. Again stupid me for believing in all of you guys." *Id.* at 33-34. On the day that N.R. went to Detective Scarpato to report the relationship, he and Limuli had an exchange in which he accused her of threatening to tell the police he was blackmailing her. He wrote "Listen, you threatened to get me charges on blackmailing. For that, I can't be cool with you." *Id.* at 37. Limuli responded, "You keep on telling me that if I don't give

you bread,[4] you're not going to have my back." *Id.* She asked him multiple times not to talk to the police. *Id.* at 36-39.

Limuli testified on her own behalf and contradicted N.R.'s version of events. She explained that N.R. spent a lot of time in her classroom working on his laptop or talking with friends. At the end of November, she noticed N.R. sitting at her desk and using her computer. The next day, December 1, 2015, she received an order confirmation from Amazon for two pairs of men's boots that she had not ordered. She confronted N.R. about using her account and he said, "If you know what's good for you, you'll leave the order alone." *Id.* at 54. N.R. told her that he had seen conversations on her cell phone concerning an extramarital affair and that he would tell her husband if she cancelled the order. Limuli said that she did not lock her cell phone and he must have found it on her desk. She did not cancel the order because she did not want N.R. to tell her husband about her affair.

Limuli testified that N.R. continued to ask her for large amounts of cash and other items. She said that he would send her pictures of expensive items and demand that she send confirmation that she ordered them. She said that in addition to threatening to tell her husband about her affair, N.R. said that he knew people "in jail" who would "shoot [her] for a hundred dollars." *Id.* at 57. She said that he ordered the dirt bike for himself and that he took her

---

[4] N.R. testified earlier in the trial that bread refers to money.

credit card information from her purse when she was not in the room. She testified that N.R. escalated to making threats against her family, saying that he would "make [her] son go missing." *Id.* at 61. On one occasion he left a picture of her son's school on her desk with a note that said, "Look familiar?" *Id.* She did not report the threats to the school or police because she was afraid of him.

Regarding the trip to the outlet stores, Limuli said that while she was at the outlets with her son, N.R. called her multiple times and she told him where she was. She said that he then came to the outlets with a friend and demanded that she make purchases for him. In January 2016, N.R. told Limuli that he needed $70,000 for college and for her to rent a house for him for spring break. She said at that point he told her that he "was look[ing] up what happens with teachers and sexual relationships," which she believed was a threat. *Id.* at 66. She denied having any sexual relationship with him. She said that he continued to ask her to buy things for him until April 2016, even after the investigation was in progress.

On cross-examination, Limuli admitted that even though she said that the threats began on December 1, 2015, there were twelve phone calls between her and N.R. during the Thanksgiving break. The Snapchat logs also confirmed 217 messages between the two of them prior to December 1, 2015. She said that N.R. had told her to use Snapchat and put his information in her phone. The Commonwealth produced an email dated November 4, 2015, sent

from Limuli's account to N.R.'s mother praising N.R.'s character and work habits. Limuli denied writing the email and said that N.R. must have sent it from her computer. The Commonwealth also produced two messages that Limuli sent to another student in January 2016 saying that she loved a group of male students, including N.R., and would miss them when they graduated. *Id.* at 104-05.

Limuli denied buying N.R. alcohol on the day that they went shopping at the outlets. She said that she purchased liquor at the store in his neighborhood, which was ten miles from her home, for use at her family's restaurant. She explained that he left a bag in her car and demanded that she bring it to him. She did not have the picture of her son's school that she alleged N.R. had left for her and did not know where it was. She testified that she thought the police would find all of N.R.'s threatening messages through their investigation, but that she deleted them from her phone after he sent her a Snapchat message that said, "Delete all or die." *Id.* at 96. Finally, Limuli admitted that the man with whom she was having an affair was a former student who she had met at Upper Dublin High School. She testified that he was 21 or 22 years old.

Limuli offered three character witnesses: Frederick Mumenthaler (Mumenthaler) and Wilmer and Peggy Benner (collectively, the Benners). Mumenthaler testified that he had known Limuli for six or seven years and that she had a reputation in the community for being honest and law-abiding.

The Benners testified that they had known Limuli for 20 years and that she had a reputation in the community for being honest, law-abiding and peaceful.

Following the reception of evidence, the jury found Limuli guilty of two counts of institutional sexual assault and not guilty of the remaining counts.[5] At each count, the trial court sentenced Limuli to 2 to 12 months of incarceration, imposed concurrently. On the first count, the trial court imposed an additional consecutive period of 3 years of probation. This Court affirmed the judgment of sentence on July 9, 2018, and Limuli did not seek further review. **Commonwealth v. Limuli**, 2099 EDA 2017, at *5 (Pa. Super. July 9, 2018) (unpublished memorandum).

**B.**

On August 2, 2019, Limuli filed the instant timely PCRA petition. Relevant to this appeal, she argued that trial counsel had been ineffective in preparing and examining the Benners. She argued that in addition to asking about her reputation for being honest, law-abiding and peaceful, trial counsel should have asked the Benners about her reputation in the community for chastity, good morals and decency. Limuli attached affidavits from each of the Benners in support of her petition. The Benners both averred that if they

---

[5] Specifically, the jury found Limuli guilty of one count based on deviate sexual intercourse and one count based on indecent contact. It found her not guilty of nine counts based on deviate sexual intercourse and one count based on sexual intercourse.

had been asked, they would have testified that they "knew of Ms. Limuli's reputation in the community for being a decent person who was known to be of high moral character."  Petition for Relief Under the Post-Conviction Relief Act, 8/2/19, Exhibits A & B.

The Commonwealth filed an answer and motion to dismiss the petition arguing that in light of the evidence presented at trial, Limuli could not establish that she was prejudiced by trial counsel's failure to elicit this character evidence.  On December 20, 2019, the PCRA court issued a notice of intention to dismiss the petition without a hearing pursuant to Pa.R.Crim.P. 907.  Limuli filed a response to the notice and on January 15, 2020, the PCRA court dismissed the petition.  Limuli filed a timely notice of appeal.  The PCRA court did not order Limuli to file a concise statement of issues complained of on appeal, but on January 29, 2021, it issued an opinion pursuant to Pa.R.A.P. 1925(a) addressing all the claims raised in Limuli's petition.

## II.

Limuli raises one issue on appeal:  whether the PCRA court abused its discretion by dismissing her claim that trial counsel was ineffective for failing to ask the Benners about her reputation in the community for good morals and decency.[6]  She argues that the central issue for the jury to weigh was

---

[6] "The standard of review of an order dismissing a PCRA petition is whether that determination is supported by the evidence of record and is free of legal error."  **Commonwealth v. Weimer**, 167 A.3d 78, 81 (Pa. Super. 2017). *(Footnote Continued Next Page)*

N.R.'s credibility versus her own. She acknowledges that her character witnesses testified that she had a reputation for being honest, law-abiding and peaceful. However, she contends that in a case concerning sexual offenses, her reputation for decency and good morals was additional evidence that may have swayed the jury to credit her testimony over N.R.'s.

"To prove counsel ineffective, the petitioner must show that: (1) his underlying claim is of arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3) the petitioner suffered actual prejudice as a result." *Commonwealth v. Sarvey*, 199 A.3d 436, 452 (Pa. Super. 2018). "[F]ailure to prove any of these prongs is sufficient to warrant dismissal of the claim without discussion of the other two." *Commonwealth v. Robinson*, 877 A.2d 433, 439 (Pa. 2005) (citation omitted). We presume that counsel has rendered effective assistance. *See Commonwealth v. Treiber*, 121 A.3d 435, 445 (Pa. 2015).

Under Pa.R.E. 404(a)(2)(A), a defendant may offer evidence of her reputation in the community for a character trait that is pertinent to the crime

---

"The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record." *Id.* (citation omitted). "[A] PCRA court has discretion to dismiss a PCRA petition without a hearing if the court is satisfied that there are no genuine issues concerning any material fact; that the defendant is not entitled to post-conviction collateral relief; and that no legitimate purpose would be served by further proceedings." *Commonwealth v. Brown*, 161 A.3d 960, 964 (Pa. Super. 2017) (citations omitted).

charged. *See Commonwealth v. Lauro*, 819 A.2d 100, 109 (Pa. Super. 2003). "Evidence of good character is to be regarded as evidence of substantive fact just as any other evidence tending to establish innocence and may be considered by the jury in connection with all the evidence presented in the case on the general issue of guilt or innocence." *Commonwealth v. Hull*, 982 A.2d 1020, 1023 (Pa. Super. 2009) (internal quotations & citation omitted). Character evidence may be particularly important in a case that depends on weighing the credibility of an accuser against the credibility of the defendant. *See id.* at 1026-27.

Limuli cites *Commonwealth v. Weiss*, 606 A.3d 439 (Pa. 1992), in support of her position. There, the defendant was charged with sexually abusing his four-year-old daughter. The victim's mother testified that the victim acted unusual when she returned home from visiting her father and that three days later, she discovered a cut on the victim's vaginal area. The defendant denied the allegations. On appeal, he argued that trial counsel was ineffective for failing to call character witnesses who would have testified (1) to his good character, and (2) that his estranged wife had bad character. *Id.* at 441.

Our Supreme Court agreed that the claim had merit, stating

[i]n a case such as this, where there are only two direct witnesses involved, credibility of the witnesses is of paramount importance, and character evidence is critical to the jury's determination of credibility. Evidence of good character is substantive, not mere makeweight evidence, and may, in and of itself, create a reasonable doubt of guilt and, thus, require a verdict of not guilty.

*Id.* at 442. The Court determined that the failure to call character witnesses was prejudicial under the circumstances of the case. The defendant and his wife were involved in a custody dispute, the cut may have been inflicted after the daughter left the defendant's care, and the defense's theory at trial was that the wife had orchestrated the charges. *Id.* at 443. The Court held that "[c]onsidering there was no overwhelming evidence of guilt in this case, credibility of the witnesses was of paramount importance," and, thus, the failure to call character witnesses was prejudicial. *Id.*

In dismissing Limuli's claim, the PCRA court concluded that she had failed to establish that she was prejudiced by the omission of her proffered character evidence. The PCRA court pointed out that neither of the Benners' affidavits stated that Limuli had a reputation for chastity, only decency and good morals. It also found that in light of Limuli's admission that she had engaged in an extramarital affair with a former student, any testimony regarding chastity, decency or good morals would not have been likely to affect the outcome of the trial. *See* PCRA Court Opinion, 1/29/21, at 7-8.

Here, it was undisputed that Limuli was a teacher at Upper Dublin High School and that N.R. was a student. The only factual issue for the jury to resolve was whether any sexual contact had ever taken place between the two. *See* 18 Pa.C.S. § 3124.2(a.2)(1). Limuli's argument focuses primarily on the credibility of N.R. as a witness, as he made prior inconsistent statements early in the investigation denying the sexual relationship, and

there were discrepancies between his testimony at the *habeas corpus* hearing and his testimony at trial.[7]  However, there was significant corroborating evidence to support N.R.'s allegations and undermine Limuli's version of events.

At trial, the Commonwealth offered numerous messages sent between Limuli and N.R. as well as logs of hundreds of text messages, phone calls and Snapchat messages.  The messages corroborated N.R.'s timeline of events, as they began in November 2015 and continued through the day that N.R. reported the relationship to Detective Scarpato.  In the messages, N.R. and Limuli referred to each other as "baby" and "bae," and Limuli wrote "Come on baby, you know I love you," "I need you today," and made a sexual innuendo in response to N.R. asking her for money for food.  Notes of Testimony, 2/21/17, at 50-54.  After Limuli purchased the $930 dirt bike for N.R., she sent him messages that read, "You know I have a life outside of getting stuff for you all the time.  Will I see you after detentions?" and "Dude you're killing me.  It's all want want with you.  Remind me again why I ordered you a freaking bike."  *Id.* at 59-60.

In January 2016, well after Limuli alleged N.R. began threatening her, she sent messages to another student at the school saying that she was out

_____

[7] In both proceedings, N.R. was unequivocal that sexual contact occurred in the form of oral sex, sexual intercourse and touching his penis through his clothing.  However, his testimony differed on issues such as how many incidences occurred in each month or when the sexual relationship began.

"clubbing with her friends," and "I thought we were all go [sic] out tonight," asking "Is my boy [N.R.] being good," and saying, "You guys wanna be with the little girls." Notes of Testimony, 2/22/17, at 29. She also sent the student messages lamenting that she would miss N.R. and other male students when they graduated and saying, "I really do love you guys." *Id.* at 104-05. While Limuli claimed that N.R. sent her messages threatening her during this time, no threats were recovered. The only messages related to blackmail involved N.R. accusing Limuli of lying about him to the police. In the same conversation Limuli repeatedly asked N.R. not talk to the police. *Id.* at 36-39.

Unlike *Weiss*, *supra*, the evidence at trial in this case did not depend entirely on the jury crediting one witness's testimony over another's. Rather, there was substantial corroborating evidence supporting N.R.'s version of events and undermining Limuli's claim that she had been frightened of and threatened by N.R. for months. Further, the character evidence that was presented at trial squarely addressed the issue of Limuli's credibility, while counsel in *Weiss* failed to introduce any character evidence. *See also Commonwealth v. Harris*, 785 A.2d 998, 1000 (Pa. Super. 2001) (defendant was prejudiced by trial counsel's failure to call available character witnesses at all). Three character witnesses testified that Limuli had a reputation in the community for honesty. The jury could have credited this evidence to conclude that her testimony was more trustworthy than N.R.'s, particularly because N.R. admitted he lied during the investigation. However,

it chose not to do so. We cannot conclude that additional testimony related to decency or good morals would have altered the outcome of the case when the jury had already heard testimony about Limuli's reputation for honesty.

Limuli faults the PCRA court and the Commonwealth for relying on her testimony regarding her extramarital affair in support of their conclusions that she suffered no prejudice. She claims that because there was no evidence that her extramarital affair began while the individual was still a student at her school, the jury could still have credited her evidence that she had a reputation for decency and good morals. This argument ignores the fact that the relationship was an extramarital affair that Limuli admitted to concealing from her husband. She testified that she initially acquiesced to N.R.'s demands so that he would not tell her husband that she was having an affair. These circumstances alone, unrelated to the age of her partner or how they met, would have undermined evidence related to her reputation for decency and good morals. As a result, we conclude that the PCRA court did not abuse its discretion in dismissing Limuli's petition without an evidentiary hearing as she failed to establish that she was prejudiced by trial counsel's failure to question her character witnesses regarding her reputation for decency and good morals.

Order affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 6/16/2021*